Commonwealth *v.* Schuck, Appellant.

Argued May 26, 1960. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

*John V. Snee,* for appellant.

*Joseph S. Walko,* First Assistant District Attorney, with him *Clarence D. Neish,* Assistant District Attorney, and *Richard P. Steward,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, September 26, 1960:

The defendant, Arthur Grover Schuck, was indicted and tried before a jury for the murder of Vincent J. Quigley in Beaver County, Pennsylvania. He was found guilty of murder in the first degree and the penalty was fixed at death. From the judgment of sentence and denial of a new trial, this appeal was filed.

We have examined the record, as required under the provisions of the Act of February 15, 1870, P. L. 15, §2, 19 PS §1187, for the purpose of determining whether the essential ingredients of murder in the first degree affirmatively appear therein and we are completely satisfied that the facts and circumstances of the crime, as shown by the testimony, definitely support the conviction.

On Sunday, April 27, 1958, shortly after two o'clock a.m., William Engle, Angeline J. Pugliano and Quigley were riding in the front seat of an automobile

operated by Engle on Ann Street in the village of Brownsdale, Economy Borough, Beaver County. Engle and Miss Pugliano were engaged to be married the following June. Quigley resided in a dwelling on Ann Street and Engle was in the process of driving him from his place of employment to his home. He drove the automobile a short distance beyond the Quigley residence and turned into a private driveway on property of one Mrs. Olga S. Ray, intending to turn around and proceed down Ann Street to permit Quigley to alight. As the vehicle was stopped momentarily, shots were fired from a .348 caliber Winchester rifle into the rear and side portions of the vehicle. Engle and Quigley were struck by some of the bullets and both died instantly.[1] Miss Pugliano was injured.

The latter testified that as Engle's car started to back out of the Ray driveway, a loud bang or shot sounded. Then, a second shot followed and a bullet came through the back of the car. There was a splatter of blood. Quigley got out of the car and yelled, "Hey, Cook, what are you doing? Are you crazy?" Then, there was a third shot as Quigley fell back into the car, grabbing himself about the abdomen and slumping over. Miss Pugliano then crouched down on the floor at the middle portion of the seat with her back towards the front of the car. Looking through the front window on the passenger side, she saw a man spreading his legs, leveling a rifle, and firing two more shots into the car. The man then walked around to the driver's side of the car, put his face very close to the glass and looked in. He then walked back to a car parked a short distance away, started the motor,

---

[1] Quigley's face was almost completely blown off and another projectile entered the left side of the chest, passed through the body, completely severing the spinal column in the second and third thoracic region.

backed up the street with the headlights on and then turned them off while driving away.

The accused denied being in the vicinity of the shooting and committing the murders. He testified that he had been drinking heavily Saturday afternoon and night, and could not specifically account for his actions during the important hours involved. He suffered a complete lapse of memory for the period of from about twelve midnight, when he left a tavern in Ambridge, until he was in his home and knocked over an ash tray while preparing for bed. His wife testified that he arrived home about two-fifteen o'clock in the morning (Sunday) and that he was "real drunk." Other witnesses testified to seeing him drinking in taverns in Ambridge during the course of Saturday night. Some testified that at the time he was not intoxicated; one testified that he appeared to be intoxicated.

Following the shooting, state and local police went to the defendant's residence about four o'clock a.m. and found him in bed. He awakened swinging and kicking. In the kitchen under a couch or daybed, they found a .348 caliber Winchester rifle, admittedly the defendant's property. Four rounds of ammunition were in the magazine. In the right front pocket of a pair of trousers on the chair near his bedside, they found three loaded .348 caliber cartridges. Five such discharged shells were found at the scene of the shooting. Expert testimony was offered to the effect that tests proved these shells had been discharged from the defendant's rifle.[2]

---

[2] In the State Police laboratory in Harrisburg loaded cartridges were fired from the defendant's rifle. Examination disclosed markings across the primers identical to those which existed on the discharged shells found at the murder scene. The firing pin indentation was off center and was in the same location on each discharged shell. The heads and rims manifested similar extractor markings.

Miss Pugliano, at the trial, positively identified the defendant as the man she saw firing the shots into the death car. She had never known the defendant before. As a result of her injuries, she was hospitalized for three weeks and, following her release, she was taken to police headquarters to observe a lineup consisting of six males. On this occasion, she definitely picked out and identified the defendant as the murderer.

Mrs. Ray, in whose driveway this tragedy occurred, was awakened by the first shot and ran to the front bedroom window. She saw the man firing shots from a rifle into the car and telephoned the police. She described the man in detail to the investigating officers. At a police line-up, she identified the defendant as being that man. At the trial, she testified that the defendant looked similar to the man she saw doing the shooting.

Witnesses also described the automobile parked at the scene of the shooting in which the slayer made his escape. The descriptions substantially fitted the automobile the defendant was driving that night.

Edward and Rose Ragozine reside in a house fronting on Ann Street, a few houses and a short distance away from the Ray property, the scene of the shooting. Almost immediately after the shooting, Mr. and Mrs. Ragozine arrived at their home in their automobile, after being out for the evening. It was to them that Miss Pugliano ran screaming for help. Testimony at the trial indicated a strong similarity of appearance between the Engle automobile and the Ragozine automobile.

The defendant and Mrs. Ragozine had been having a close association for sometime previously. The details, most of which the defendant admitted, were outlined in her testimony at the trial. She testified, inter

alia, that she had been trying to bring this relationship to an end for months and on one occasion had caused the defendant's arrest; that the defendant told her that if he could not have her, no one else would; that he threatened to kill her and her family; that he frequently called her on the telephone; and, that he drove his automobile up and down the street in the block where she resided, tooting the horn. On one occasion, he told her that he had hired some men to kill her husband. On another occasion, he drove her to the vicinity of his home, asked her if she was going to go away with him, and she said she would if he didn't hurt her husband. He said he would anyhow. When she attempted to leave the automobile, he hit her with a hammer and threatened her with a revolver which he pressed to her body. On another occasion, he threatened to blow her husband's head off, and said he had a weapon which could get him from a mile away. He warned her this would happen if more than five days elapsed without her contacting him. On the Sunday before the shooting, he told her over the phone, "I am going to do what I said I would, I am going to kill all of you." She replied, "If that is the way you feel, go ahead and do it. . . . I'll never talk to or see you again."

In view of the overwhelming evidence, there can be no reasonable doubt as to the defendant's guilt. The record depicts the mind of a malicious man long bent on murder. The two unfortunate victims, undoubtedly, died because of mistaken identity.

The defendant was given a very fair trial. His defense was presented in adequate fashion. In support of the motion for a new trial several reasons are assigned but careful consideration indicates lack of merit in each and every one of them.

Miss Pugliano suffered from two or three small particles of glass in the surface of each eye from the

shattering of the automobile window glass during the shooting. An effort seriously to impugn her physical competency to see and later identify the defendant was made by defendant's counsel during her cross-examination. A medical doctor, an eye specialist, who removed these foreign substances and treated her for these injuries during her stay in the hospital, was permitted to testify that, in his opinion, these injuries and the presence of these foreign substances did not impair her vision on the occasion involved. This testimony was clearly admissible under the circumstances. Whether or not Miss Pugliano's testimony was correct and credible, particularly her identification of the accused, was for the jury to decide in the light of all the attending facts which were explicitly brought forth at the trial. On appeal, it is not within the province of the appellate court to pass upon the credibility of the testimony: *Commonwealth v. Logan,* 361 Pa. 186, 191, 192, 63 A. 2d 28 (1949).

It is argued that the lower court erred in not awarding a new trial because of after-discovered evidence. The defendant, approximately seven months after trial, submitted an affidavit made by a man named Hickey. It states, in the part most material here, that the affiant saw the defendant engaged in a fist fight at approximately one forty-five a.m. at or near the intersection of 24th Street and Duss Avenue in the town of Ambridge. (The time is fixed from memory of a conversation with a girl in whose company he had been minutes before, who indicated, after looking at her wrist watch, that it was then one forty-five a.m.). Further, that the defendant appeared to be under the influence of alcohol. The scene of the shooting is only a short distance and a few minutes away from this area of Ambridge. We cannot see how this evidence would, in view of the guilt-convincing testimony, pro-

duce an iota of a change in the result. It does not raise a substantial doubt as to the guilt of the defendant. The defendant, according to the testimony offered at the trial, was in the area of Ambridge as late as twelve-thirty o'clock a.m. on the morning of the shooting. He and his counsel had ample opportunity to, and did in fact, produce for the consideration of the jury quantitive testimony of his drinking and visitations in that community on the previous night. Hickey's testimony as to the defendant's insobriety was merely corroborative and cumulative. It is, also, well within the range of that type of testimony which was available to the defendant without difficulty and through the exercise of reasonable diligence before trial. In order to justify the grant of a new trial on the basis of after-discovered evidence, the evidence must have been discovered after the trial and must be such that it could not have been obtained at the trial by reasonable diligence, must not be cumulative or merely impeach credibility, and must be such as would likely compel a different result: *Hagopian v. Eskandarian,* 396 Pa. 401, 407, 408, 153 A. 2d 897 (1959) ; *Commonwealth v. Clanton,* 395 Pa. 521, 526, 151 A. 2d 88 (1959) ; *Commonwealth v. Green,* 358 Pa. 192, 199, 56 A. 2d 95 (1948). As to the defendant's presence in Ambridge as late as one forty-five o'clock a.m. or even minutes later (although the time is fixed by hearsay), this would not physically prevent the defendant from driving to and arriving at the scene of the shooting before two-ten o'clock a.m., the approximate time of the slayings.

Defendant's counsel also argues that those portions of the charge of the trial judge relating to circumstantial evidence, the burden of proof and the meaning of reasonable doubt were inadequate and misleading. An examination of the charge discloses correct and com-

plete instructions in regard to each and every relevant principle of law, and the application thereof was explained in fair and understandable language. Assignment of these alleged errors indicates merely a desperate grasping for straws in an effort to arrest the effect of a just verdict.

Judgment and sentence affirmed.