354 A.2d 545
**COMMONWEALTH of Pennsylvania**

v.

**Lois June FARQUHARSON, Appellant.**
Supreme Court of Pennsylvania.

Argued Oct. 24, 1975.

Decided Jan. 29, 1976.

Rehearing Denied April 20, 1976.

52

Joseph Alessandroni, Jr., Philadelphia, for appellant.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., Carolyn E. Temin, Philadelphia, for appellee.

Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

NIX, Justice.

Appellant, Lois June Farquharson, a psychiatrist, was indicted in the shooting death of Leon Weingrad, D.O., and convicted of murder of the first degree after a trial by jury which lasted over three weeks. Post-trial motions were argued before a Court en banc and were denied. A sentence of life imprisonment was imposed under the murder indictment and a two year concurrent sentence of imprisonment was imposed under the conspiracy indictment.[1] Appellant filed this appeal from the judgment of sentence entered under the murder indictment and was permitted, by this Court, to proceed in forma pauperis.

The sordid events which ultimately led to this senseless killing commenced in 1969 when Gloria Burnette, who was then a patient at the Ancora State Hospital in New Jersey, was placed under the care of Dr. Farquharson. Ms. Burnette had been experiencing mental and emotional problems since age 17 and had previously been confined on several occasions because of these difficulties. After being discharged from the hospital, Gloria maintained communication with Dr. Farquharson and the relationship subsequently developed into a homosexual union between the two. Thereafter, Dr. Farquharson left the staff at Ancora and became affiliated with the Pennsylvania State Hospital at Byberry. The couple moved from New Jersey to an apartment at the Society Hill Towers in Philadelphia.

Gloria also obtained employment at Byberry in the capacity of an attendant. During this time, the couple became acquainted with the deceased who had an office at Byberry situated directly across the hall from the office occupied by appellant. Dr. Weingrad also resided at So-

1. No appeal has been taken to this Court of the judgment of sentence imposed under the conspiracy bill of indictment.

ciety Hill Towers with his wife and two infant sons. Appellant began accusing Gloria of engaging in an illicit affair with Dr. Weingrad. As a result of these accusations, the relationship between appellant and Gloria became strained and was frequently punctuated by incidents of physical abuse.

The couple began engaging in a course of harassment against Dr. Weingrad which included slashing the tires of his automobile and breaking his automobile windshield. Throughout this period, Gloria charged that appellant was virtually at all times under the influence of either alcohol or drugs. She acknowledged that she too indulged in these practices. The relationship between Dr. Weingrad and the appellant deteriorated further when Dr. Weingrad spoke with Dr. Farquharson's superiors complaining about the quality of Dr. Farquharson's work at the hospital.

Ms. Burnette, testifying as a witness for the Commonwealth, stated that a few days prior to the fatal shooting, she had used Dr. Farquharson's identification for the purpose of securing a revolver. She stated that Dr. Farquharson had expressed their need for a gun in their apartment because of a number of burglaries which had occurred in their apartment building. The weapon was obtained on Friday, the 27th of August.

Gloria testified that when they awoke on Sunday morning, August 29th, she informed Dr. Farquharson of her intention to kill Dr. Weingrad for the purpose of proving to Dr. Farquharson her love.[2] It was her testi-

___

2. The pertinent portion of Ms. Burnette's testimony concerning the Sunday morning conversation was as follows:

"A. I told her, I said, 'The only way I could prove that I love you is to kill the guy.' I says, 'I can't do anything else.' I said, 'You keep harassing me. You keep beating me up. You won't believe anything I tell you.' I said, 'I don't know what else to do.' She said, 'We can get somebody from Baltimore, Maryland, to kill him,' and I said, 'Who do you know from Baltimore, Maryland?' And she said, 'I'm not going to tell you

mony that she believed that this was the only way she could convince appellant that her (appellant's) jealousy was unfounded. Appellant responded by suggesting that she (appellant) could find someone in Baltimore, Maryland, who would be willing to do the killing for them. This proposal was rejected by Ms. Burnette. The parties then agreed that Gloria would kill Dr. Weingrad and pursuant to that purpose the couple left their apartment and went to the apartment of the deceased.

Upon learning that Dr. Weingrad's wife and small children were also in the apartment, Ms. Burnette gained admittance by asking the doctor to treat a burn on her foot which she had sustained the previous day.[3] After attending the foot, Dr. Weingrad left the apartment along with Gloria. The deceased was required to go to the Police Administration Building and was in the process of leaving home for that purpose when Gloria

> that.' She said, 'We can get somebody else to kill him and that way you wouldn't get caught.'
> Q. . . . After the discussion to get somebody from Baltimore, Maryland, did you accept that offer or reject it?
> A. I rejected it.
> Q. Did you tell her that you were going to do it youself?
> A. Yes.
> Q. What was your answer to that?
> A. She stated, 'Okay;' she would go with me.
> Q. Now, the two of you went down to the garage together; is that right?
> A. That is correct.
> Q. Who of the two of you had the gun?
> A. I had the gun.
>
> . . . . . . . . .
> Q. When you went down to the garage did you discuss who was suppose to do what?
> A. No. We had already discussed it. She says, 'we can go down though the garage. When he opens the door of his apartment, shoot him in the head.'
> Q. Where was she suppose to be?
> A. Fire steps door.
> Q. Did she tell you what, if anything, would happen if you didn't shoot?
> A. That I couldn't live with her any longer."

**3.** According to the testimony of Ms. Burnette, appellant waited behind the fire exit door as the witness gained entrance to the apartment of the deceased.

arrived.[4] When the deceased and Gloria reached the parking lot, they were observed engaged in a violent argument and shortly thereafter, Gloria fired several shots fatally wounding Dr. Weingrad.

In response, Dr. Farquharson denied that she had expressed a need to have a weapon in the apartment and testified that she was not aware that Gloria intended to purchase the gun. She stated that when she became aware of the acquisition of the pistol, she insisted that it be returned. Appellant also testified that the quarrels between the two were inspired by Gloria's jealousy and not hers. Dr. Farquharson further testified that she had not had a personal confrontation with the deceased and although she admitted harboring hostility towards Dr. Weingrad, she stated that the reason for this attitude was as a result of Gloria's continuous assertions that Dr. Weingrad was attempting to jeopardize appellant's position at the hospital. Dr. Farquharson testified that she did not recall Gloria expressing to her an intention to kill Dr. Weingrad. Significantly, however, she did not dispute the possibility that such a conversation may have taken place but merely asserted that she could not recall it. The position of the defense at trial was that Dr. Farquharson did not participate in any conspiratorial agreement to murder Dr. Weingrad.[5]

**4.** Dr. Weingrad served as a police surgeon for the City of Philadelphia for a number of years.

**5.** The critical testimony offered by Dr. Farquharson concerning the alleged conversation was as follows:

"Q. You tell us what happened that morning.

A. We got up. We had slept rather late. I can't give you an exact time, but I would say that it was 11 o'clock or later, and it does not matter who fixed breakfast. I know Gloria said she fixed breakfast. It seems to me I did because I remember looking at those biscuits for three days after that. But, at any rate, during the night she had gotten the bandages off of her foot, and I didn't have any more. She was complaining of some pain, and I'm sure she had some. I said, 'Gloria, I don't have any more Furacin.' I said, 'I don't know where you can get any on Sunday in Center City, Philadelphia' and I said, 'The only thing I would

The theory upon which the Commonwealth predicated its case against appellant was one of vicarious liability as a consequence of shared criminal intent and the existence of a conspiracy between appellant and Gloria Burnette to murder Dr. Weingrad.

"It is established beyond question that the wounds causing death of the victim were inflicted by one other than the appellant and therefore, criminal responsibility can only attach to the appellant through some theory of vicarious liability. All theories that are recognized under our law to hold one responsible for the criminal acts of another require the existence of a shared criminal intent. It is well settled that the nexus which renders all members of a criminal conspiracy responsible for the acts of any of its members is the

know to do would be to maybe go to an emergency room and get a tetanus toxoid shot.' I said, 'That's about the only thing I can think of unless you can wait until tomorrow.' And I think she said, 'I wonder if Dr. Weingrad has any Furacin.' and I said, 'Gee, I'd have no idea of whether he does or not.' And she said, 'I'll call him.' And I probably said, 'Okay'.

 . . . . . . . .

Q. Now, you recall what Gloria Burnette said about there being an argument about Dr. Weingrad that morning? Was there any such argument?
A. I don't recall it, but there may have been.
Q. And what would the argument have been about?
A. The argument would have been about the argument with Dr. Weingrad. I was, as I have said—I had—I was tired of, you know, her saying he was going to report me and all this. He hadn't said anything to me. . . .

 . . . . . . . .

Q. What I want to know, what kind of discussion did you have that morning with her particularly with reference to whether somebody should be killed?
A. I don't recall having any discussion about anybody going to be killed. I said—she may have said, 'I am going to kill him,' and I may have said, 'That's ridiculous,' that kind of talk. 'And if it means that much to you, I'll go to Colonel Miller and ask for a transfer.' I had told her that over and over again.

 . . . . . . . .

Q. And did you have any idea that she was going up to Dr. Weingrad's apartment for any purpose other than to have her foot dressed?
A. Not for any other purpose, no sir."

unlawful agreement. *Commonwealth v. Yobbagy,* 410 Pa. 172, 177, 188 A.2d 750, 752 (1963); *Commonwealth v. Neff,* 407 Pa. 1, 7, 179 A.2d 630, 632 (1962); *Commonwealth v. Kirk,* 340 Pa. 346, 17 A.2d 195 (1941), aff'g 141 Pa.Super. 123, 14 A.2d 914 (1940); *Commonwealth v. Richardson,* 229 Pa. 609, 79 A. 222 (1911), aff'g 42 Pa.Super. 337 (1910). It is equally as clear that this element of shared criminal intent must be found to be present to justify a finding that an accused was an accomplice. *Commonwealth v. Lowry,* 374 Pa. 594, 600, 98 A.2d 733, 736 (1953), cert. denied, 347 U.S. 914, 74 S.Ct. 479, 98 L.Ed. 1070 (1954); *Commonwealth v. Thomas,* 357 Pa. 68, 72, 53 A.2d 112, 114 (1947); *Commonwealth v. Doris,* 287 Pa. 547, 135 A. 313 (1926)."

*Commonwealth v. Wilson,* 449 Pa. 235, 237–238, 296 A.2d 719, 721 (1972).

Although appellant has raised numerous arguments in support of this appeal, only some are deserving of extensive discussion. Appellant contends that the testimony of Gloria Burnette was so unreliable and untrustworthy that the jury should have rejected it as not being credible. Proceeding from this premise, it is urged that since the jury apparently did rely upon this testimony in reaching their finding of guilt, a new trial must now be awarded.

██ Traditionally under our system of jurisprudence, issues of credibility are left to the trier of fact for resolution. *Commonwealth v. Hampton,* 462 Pa. 334, 341 A.2d 101 (1975); *Commonwealth v. Murray,* 460 Pa. 605, 334 A.2d 255 (1975); *Commonwealth v. Oates,* 448 Pa. 486, 295 A.2d 337 (1972); *Commonwealth v. Garvin,* 448 Pa. 258, 293 A.2d 33 (1972). While there may be some legitimacy for a trial court, who has also observed the witnesses as they testified, to consider the weight of the evidence and to that extent review the jury's deter-

mination of credibility, there is surely no justification for an appellate court, relying solely upon a cold record, to exercise such a function.

"On appellate review of a criminal conviction, we will not weigh the evidence and thereby substitute our judgment for that of the finder of fact. *Commonwealth v. Woodhouse*, 401 Pa. 242, 261, 164 A.2d 98 (1960). To do so would require an assessment of the credibility of the testimony and that is clearly not our function. *Commonwealth v. Sullivan*, 436 Pa. 450, 456, 263 A.2d 734 (1970) cert. denied, 400 U.S. 882, 91 S.Ct. 127, 27 L.Ed.2d 120; *Commonwealth v. Schuck*, 401 Pa. 222, 228, 164 A.2d 13 (1960), cert. denied, 368 U.S. 884, 82 S.Ct. 138, 7 L.Ed.2d 188 (1961)."
*Commonwealth v. Paquette*, 451 Pa. 250, 257, 301 A.2d 837, 841 (1973).

█ This concept, however, must be distinguished from an equally fundamental principle that a verdict of guilt may not be based upon surmise or conjecture. *Commonwealth v. Stanley*, 453 Pa. 467, 309 A.2d 408 (1973); *Commonwealth v. Bailey*, 448 Pa. 224, 292 A.2d 345 (1972); *Commonwealth v. McFadden*, 448 Pa. 146, 292 A.2d 358 (1972); *Commonwealth v. Garrett*, 423 Pa. 8, 222 A.2d 902 (1966). Following this principle, courts of this jurisdiction have recognized that where evidence offered to support a verdict of guilt is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, a jury may not be permitted to return such a finding. *Commonwealth v. Bennett*, 224 Pa. Super. 238, 303 A.2d 220 (1973) (and cases cited therein). Appellant argues that the *Bennett* principle is applicable here. We do not agree.

██ The *Bennett* principle is applicable only where the party having the burden of proof presents testimony to support that burden which is either so unreliable or contradictory as to make any verdict based thereon ob-

viously the result of conjecture and not reason. In the facts of the *Bennett* case, the Commonwealth had predicated its case upon the evidence of one individual. The record clearly established that the testimony of that witness was so contradictory as to render it incapable of reasonable reconciliation and therefore the court properly refused to allow a verdict of guilt to stand. Here, appellant challenges the testimony of Gloria Burnette not only because of the presence of some contradictions but primarily because of its unreliability. We quite agree with appellant that there are many factors that would cause one to look upon the testimony of Gloria Burnette with a jaundiced eye. First, under the theory of the Commonwealth, she was the actual perpetrator of the crime and appellant was the accomplice. Where parties in crime testify against each other, their testimony must be recognized as coming from a corrupt source and therefore must be subject to the closest scrutiny. *Commonwealth v. Mouzon*, 456 Pa. 230, 318 A.2d 703 (1974); *Commonwealth v. Turner*, 367 Pa. 403, 80 A.2d 708 (1951); See generally *Commonwealth v. Coades*, 454 Pa. 448, 311 A.2d 896 (1973).

█ Next, the interest of the witness was obvious. When Ms. Burnette was called upon to testify in this trial, she had previously entered a plea of guilty to murder generally but the degree of guilt had not been determined nor had the sentence been imposed. The history of emotional and mental disturbance experienced by this witness, coupled with her belated implication of appellant, casts additional doubt as to the reliability of the accusations eventually made against Dr. Farquharson.[6]

6. For a period of one and one-half years after her incarceration, Ms. Burnette persisted in her refusal to implicate Dr. Farquharson. During this period, there were many conferences with Commonwealth officials seeking to ascertain the involvement of the appellant.

The evidence of unrequited love and consuming jealously lends added support to appellant's position.[7]

We agree that considering all of these factors [8] the evidence provided by Gloria Burnette *standing alone* might not provide the degree of certainty which must necessarily support a finding of guilt in a criminal case. However, although the testimony of Gloria Burnette was crucial to the Commonwealth's case in that it was the only direct evidence establishing Dr. Farquharson's participation in the conspiratorial design upon which liability is predicated [9], the Commonwealth was able to provide corroboration from a most impressive source, i. e., the mouth of the appellant.

At the time of her arrest, Dr. Farquharson gave a statement to police officials in which she admitted that she had a conversation with Gloria that fateful Sunday morning in which the killing of Dr. Weingrad was discussed. Dr. Farquharson said in her statement that during this conversation Gloria advised her of her (Gloria's) intention to kill Dr. Weingrad, and after unsuccessfully attempting to dissuade her from pursuing this course stated to Gloria that she should "do what she had to do . . .". Additionally, the appellant admitted at trial that she bore ill will towards the deceased although she disputed the origin of this emotion. Dr. Farquharson was also aware at the time of the conversation that Glo-

7. While Gloria was incarcerated, there was apparently a diminution in appellant's ardor and interest. When Dr. Farquharson did visit, she was accompanied by persons with whom she was then apparently having a romantic episode. Appellant stresses this as a possible motive for the witness, Burnette, to lie as to appellant's involvement.

8. Appellant also set forth the inconsistencies as to the sequence of events in the parking lot where the killing occurred between the trial testimony of Ms. Burnette and another Commonwealth witness, Vincent Riccobono. It is however significant that these inconsistencies did not relate to the crucial facts.

9. Most of the other Commonwealth's evidence as to Dr. Farquharson pertained to the deterioration of her personality and the animus she harbored towards the deceased.

ria possessed the means by which to carry out this intent to kill (the recently obtained revolver and bullets). Equally as damaging was the fact that appellant was uniquely familiar with Gloria's mental and emotional state and the likelihood that she would attempt to carry to fruition her stated purpose.[10]

Thus, although appellant did not admit that she was a part of a conspiracy to murder Dr. Weingrad, her testimony was sufficient to provide an indicium of trustworthiness to the testimony of Gloria Burnette on the critical issue sufficient to permit the question to be properly left to the trier of fact.[11] Under these circumstances, the reasoning of *Bennett,* supra is inapplicable.

Appellant also contends a new trial should be ordered as a result of alleged prejudicial remarks made by the attorney for the prosecution during the opening statement. In *Commonwealth v. Fairbanks,* 453 Pa. 90, 306 A.2d 866 (1973), citing ABA's Standards for Criminal Justice, we set the following guidelines for prosecutors in opening remarks:

> "The prosecutor's remarks in his opening statement must be 'fair deductions from evidence expected to be presented.' His remarks cannot be 'merely assertions intended to inflame the passions of the jury.'" *Id.* at 95, 306 A.2d at 868. (Citations omitted).

Thus, the crucial test is whether there was a reference to evidence absent a good faith and reasonable basis for believing that such evidence in fact was available and

10. Appellant's training as a psychiatrist and her experience with this individual placed her in an unusual position to be able to predict the significance of Gloria's stated intention to kill the deceased.

11. Restated, from the statements of appellant at trial and to the police upon her arrest, the jury was provided an independent basis for finding that the alleged Sunday morning conversation concerning the shooting of Dr. Weingrad did in fact take place. Thus, the only fact then to be resolved was the position taken by appellant in that conversation, a fact clearly appropriate for a jury to determine.

would be admissible. The specific remarks challenged by appellant relate to the prosecutor's statements suggesting the Commonwealth's intention to establish that Dr. Farquharson was also experiencing mental and emotional distress. This objection is without merit.

 Ms. Burnette testified that the behavior pattern of Dr. Farquharson changed radically and that the authorities at Ancora Hospital suggested that she seek psychiatric help. Additionally, a number of Dr. Farquharson's fellow employees were called and testified to unusual and bizarre behavior that would suggest mental illness. Counsel for the prosecution not only stated an intention to establish that appellant was experiencing emotional and mental difficulties, but in fact, produced witnesses who presented persuasive testimony on the issue. The Commonwealth is not required to prove conclusively all statements alluded to during the opening statement. Such a requirement would obviously be absurd. Where it is shown that there is a good faith, reasonable basis to believe that a certain fact will be established, reference may properly be made to it during opening statements.

██ Additionally, even if the remarks were improper, relief will only be granted where the unavoidable effect is to so prejudice the finders of fact as to render them incapable of objective judgment. *Commonwealth v. Martin*, 461 Pa. 289, 336 A.2d 290, 292 (1975). Such is clearly not the case here.

██ Appellant further raises several objections to the court's evidentiary rulings during the course of the trial. It is argued that the testimony of Mrs. Barbara Weingrad, wife of the deceased, as to the content of conversations with her husband concerning the difficulties Dr. Weingrad had been experiencing with appellant and Ms. Burnette was hearsay and therefore inadmissible. However, no objection was made to the introduction of this evidence. Where evidence, incompetent as hearsay,

is admitted without objection it may be given its natural probative effect as if it was in law admissible. *Poluski v. Glen Alden Coal Co.*, 286 Pa. 473, 476, 133 A. 819, 820 (1926).

Similarly, it is contended that the testimony of Mr. Vincent Riccobono contained inadmissible hearsay which was so prejudicial as to warrant the grant of a new trial. Mr. Riccobono was called by the Commonwealth and permitted to testify without objection that he had been a friend of long standing of the deceased and that he met the deceased, by chance, moments before the shooting in the parking lot of the apartment complex. Mr. Riccobono stated that he observed a violent argument between Ms. Burnette and Dr. Weingrad. When the argument subsided and Ms. Burnette passed out of his view he approached the deceased and attempted to ascertain the reason for the disagreement.

In response to questioning by the Assistant District Attorney, the following dialogue occurred:

"Q. After a conversation with Ms. Burnette, did he come over to you and have a conversation with you?

A. Yes, he did.

Q. What was the nature of your conversation?

. . . . . . . .

A. The nature of the conversation was—first of all, I asked him what he was doing with her, because of the position I was sitting in, from where I was sitting and from where they were standing and arguing and shouting at each other, it all looked very, very strange to me and it sounded terrible, and I said, 'What's going on? What's happening? Who is she?' And he told me about the events of the past few months previous to that day about the terrible time that he had been having with this particular person and with a Dr. Farquharson.

Q. Did you know Dr. Farquharson at that time?

A. I did not.

Q. Have you ever seen Dr. Farquharson before?

A. No.

Q. Did he tell you whether Dr. Farquharson was a male or female?

A. He told me she was a female.

Q. Had you ever seen this girl, Gloria June Burnette, before that time or know of her?

A. Never.

Q. Had Dr. Weingrad, in your conversations with him, ever spoken to you of Gloria Burnette?

A. Never.

Q. Can you be a little more specific as to the quote, terrible time he was having with Dr. Farquharson and Ms. Burnette?

A. Yes. He had told me that for the past few months, prior to that day that he had—he was being harassed by these two women—

MR. ALESSANDRONI: Your Honor, at this point, I am going to object to this as hearsay . . ."

After objection was overruled the following challenged testimony was elicited:

"Q. Tell us what he told you.

A. He said that—he first told us about his car windshield being broken and his tires being slashed and the car aerial being broken off, and I asked him what it was all about, what was happening, why all this trouble, and he said that—he went into a lot more detail. First a little and then after we prodded him, a lot, because being that he was one of my very best friends in life, I was very upset at seeing him so upset for the first time in many years.

Q. What in detail did he tell you about Dr. Farquharson and Ms. Burnette, if anything?

Well, he told us that these two women worked at the same hospital that he did, and that Ms. Burnette had been fired, and for some reason or other they felt that it was he that had something to do about her being fired and that Dr. Farquharson had accused him of having an affair with Gloria Burnette, and that this all wasn't true and it was just lots of gory details."

The Court permitted this evidence on a theory that the testimony fell within the res gestae exception to the hearsay rule. The Commonwealth in its brief has attempted to support this ruling under the theory of the declaration of present sense impression exception to the hearsay rule.[12]

 Considering first the traditional concept of a res gestae statement it is obvious that this was not a spontaneous utterance emanating from an overpowering emotional and shocking experience sufficient to exclude the possibility that the statements were the product of premeditation or design.[13] An argument by its nature is

12. At least two members of this Court in the recent decision in *Commonwealth v. Coleman,* 458 Pa. 112, 326 A.2d 387 (1974) express the view that res gestae should be considered as a generic term encompassing the declaration of present sense impression. See opinion by Mr. Chief Justice Jones joined by Mr. Justice O'Brien. In any event the declaration of present sense impression is recognized in this jurisdiction as an exception to the hearsay rule and thus, would support the Court's finding, if in fact this evidence came with this exception. See *Commonwealth v. Craven,* 138 Pa.Super. 436, 11 A.2d 191 (1939).

13. "The rule permitting res gestae declarations to be introduced in evidence has been stated in *Commonwealth v. Cheeks,* 423 Pa. 67, 223 A.2d 291 (1966): 'The principle is based upon the rationale that a spontaneous declaration of an individual who has recently suffered an overpowering emotional and shocking experience is likely to be truthful. See, 1 Henry, Penna.Evidence, § 466 (1953). Such evidence is limited to declarations supporting the conclusion that the statements were spontaneous utterances of thought created by, or emanating from, the litigated act, and so near in time thereto as to exclude the possibility that they were the product of premeditation or design. See, *Commonwealth v. Noble,* 371 Pa. 138, 88 A.2d 760 (1952); *Commonwealth v. Rumage,* 359 Pa. 483, 59 A.2d 65 (1948); and *Commonwealth v. Cupps,* 157 Pa.Super. 341, 43 A.2d 545 (1945).' "
*Commonwealth v. Banks,* 454 Pa. 401, 408–9, 311 A.2d 576, 580 (1973).

a cognitive process although admittedly not purely rational. While the reflective process is certainly affected by the emotion engendered, that process, although distorted, continues to function. We do not believe that a mere verbal argument, regardless how intense, is capable of producing such an impact upon the mental faculties which would be likely to block the reflective process and provide the requisite indicia of verity.

■ We are also not persuaded that this testimony can qualify as a declaration of present sense impression. Under this exception the necessity for the presence of a startling occurrence or accident to serve as a source of reliability is not required. The truthfulness of the utterance is dependent upon its spontaneity. It must be certain from the circumstances that the utterance is a reflex product of immediate sensual impressions, unaided by retrospective mental processes. Restated, the utterance must be "instinctive, rather than deliberate." *Commonwealth v. Coleman*, 458 Pa. 112, 117, 326 A.2d 387, 389 (1974). Under these circumstances the absence of retrospective mental action was not sufficiently clear to justify the admission of the evidence.

■ Although we agree that the learned trial court should have sustained the objection, we do not find that the admission of this testimony constituted reversible error. First, the obvious purpose of this testimony was to establish the animus existing between the deceased and appellant. The testimony of Mr. Riccobono had already established that fact prior to the objection and the challenged evidence at best provided some embellishment. Further, the fact of the enmity between the deceased and the appellant was also established by the testimony of Mrs. Weingrad, the testimony of Ms. Burnette and admitted by the appellant in her testimony at trial. Under all of these circumstances, it is clear that the error was harmless.

Finally, appellant has alleged numerous errors concerning the trial court's rulings with respect to additional hearsay testimony, relevancy of proffered evidence, leading questions and prejudicial inferences by the prosecutor, defense counsel's permissible scope of cross-examination and appellant's requested points for charge. After careful examination of the record, we find that these claims are completely devoid of merit and therefore do not warrant further exposition.

Judgment of sentence affirmed.

EAGEN, J., dissents.

MANDERINO, J., filed a dissenting opinion in which ROBERTS, J., joined.

MANDERINO, Justice (dissenting).

I dissent. I agree with the majority opinion that the prosecution's direct evidence, as testified to by Gloria Burnette, was legally insufficient to support a verdict of guilt. I disagree, however, that the statements of appellant were "sufficient to provide an indicia of trustworthiness to the testimony of Gloria Burnette on the critical issue sufficient to permit the question to be properly left to the trier of fact."

Appellant's statements reveal nothing. The majority, however, infers from them circumstantial evidence corroborating the testimony of Gloria Burnette. To do so is clearly wrong. Appellant's statements establish nothing more than her knowledge of Burnette's wish to kill the deceased and of Burnette's possession of a revolver and bullets. Appellant also admitted that she bore ill will towards the deceased. The conclusions that appellant knew that Burnette actually would kill the deceased and that appellant participated in the murder cannot be inferred from appellant's testimony. As such it does not corroborate the testimony of Burnette.

I would, therefore, reverse the jury's finding of guilt on the ground that it relied upon unreliable and uncorroborated accomplice testimony which was insufficient to support a verdict of guilty.

ROBERTS, J., joins in this dissenting opinion.