446 A.2d 1274

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Gerard Paul McKENNA, Appellant.**

Supreme Court of Pennsylvania.

Submitted Oct. 19, 1981.

Reconsideration Granted March 15, 1982.

Argued April 20, 1982.

Decided June 30, 1982.

William C. Costopoulos, Lemoyne, for appellant.

Arthur R. Shuman, Jr., Sp. Prosecutor, Philadelphia, for appellee.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY, McDERMOTT and HUTCHINSON, JJ.

OPINION

McDERMOTT, Justice.

This is an appeal from the order of the Honorable Evan S. Williams, President Judge of the Court of Common Pleas of Bradford County, denying appellant relief under the Post Conviction Hearing Act ("PCHA").[1]

On December 9, 1974, after a lengthy jury trial, appellant, Gerard Paul McKenna, was convicted of rape and first degree murder in connection with the brutal slaying of a sixteen year-old girl. The jury prescribed the death penalty for appellant's murder conviction.[2] On direct appeal to this Court, we upheld both convictions, but vacated appellant's death sentence and remanded the case for resentencing on the murder conviction. *See Commonwealth v. McKenna*, 476 Pa. 428, 383 A.2d 174 (1978) (*"McKenna I"*). Appellant was sentenced to a term of life imprisonment for his first degree murder conviction on April 17, 1978. These PCHA proceedings followed.

Post conviction hearings were held on August 21 and October 3, 1979. The court of common pleas, per President Judge Williams, denied the requested relief and appellant appealed to this Court. The Commonwealth and appellant submitted the case on their briefs,[3] and, on January 29, 1982, we filed an opinion and order reversing the PCHA court. We subsequently granted the Commonwealth's petition for reconsideration and, on April 2, 1982, we ordered that the parties prepare the case for oral argument during our April session. *See* Pa.R.A.P. 2311(b). Having carefully considered the entire record, the briefs and the able oral argu-

---

1. Act of January 25, 1966, P.L. 1580, § 1 *et seq.*, 19 P.S. § 1180–1 *et seq.*

2. Appellant was sentenced to a term of ten to twenty years' imprisonment on his rape conviction.

3. *See* Pa.R.A.P. 2311.

ments of both sides, we now vacate our order of January 29, 1982 and affirm the order of the PCHA court.[4]

Before this Court appellant most strenuously argues his claim that trial counsel was ineffective in failing to present a material and favorable defense. The gravamen of this contention is that trial counsel had material witnesses to offer in support of appellant's alibi defense but did not call them, because he believed a new trial would be granted on appeal.[5]

At the PCHA hearing, appellant's chief trial counsel, Thomas Walrath, Esquire,[6] did in fact testify that he believed the errors of the trial court sufficient to require a new trial and that he had, therefore, substantially abandoned the alibi defense.[7] *See generally,* N.T. PCHA 8/21/79

4. Jurisdiction is vested in this Court pursuant to the Judicial Code, Act of July 9, 1976, P.L. 586, No. 142, § 2, 42 Pa.C.S.A. § 722. This statute was amended subsequent to appellant's conviction, removing this Court's exclusive jurisdiction over appeals from homicide convictions. Act of September 23, 1980, P.L. 686, No. 137, § 1.

5. The record clearly shows that appellant's defense to the rape and murder charges was that he was not in the Bradford County area when the crimes were committed. The time of the victim's death, which the Commonwealth and appellant vigorously disputed, thus became a crucial issue at trial. Appellant contended that the victim was murdered around November 1, 1973, only one day before her body was found. The Commonwealth, on the other hand, presented extensive evidence to show that the victim died on October 28 or 29, 1973, shortly after her family had last seen her and while appellant was still in the vicinity. *See generally,* Opinion of Williams, P. J., at 4 (Opinion filed October 8, 1975).

6. Mr. Walrath, appellant's private counsel, was appointed by the trial court at appellant's request to represent him in this case. *See* N.T. PCHA 8/21/79 p. 42. Mr. Walrath was assisted by two other court-appointed attorneys, three special investigators, a professional legal research group and a medical expert. *See* N.T. PCHA 8/21/79 p. 44.

7. Mr. Walrath admitted at the PCHA hearings that he *did* present the alibi defense, at least in part. *See* N.T. PCHA 8/21/79 p. 75; N.T. PCHA 10/3/79 pp. 18–19. This statement is strongly supported in the record. His introduction of several exhibits, his thorough and aggressive cross-examination of the Commonwealth's witnesses and his exhaustive summation demonstrate a relentless and forceful attack on the Commonwealth's evidence as to the time of death.

pp. 60–80. We shall refrain from comment, for the purposes here, upon such unprofessional conduct, as there is no merit to appellant's contentions.

Defense counsel Walrath testified that, if he had fully presented the alibi defense, he would have called Dr. Irving Sopher, the defense's forensic pathologist, to fix the time of death, a consideration relevant to the alibi. Dr. Sopher was called at the PCHA hearing, not by appellant, but by the Commonwealth, and he testified as follows:

> [SPECIAL PROSECUTOR]: Do you know why it was that you were not called as a witness in this case?
>
> [DR. SOPHER]: I think one of the main ... my main impression is after discussing with Mr. Walrath by phone as to whether I would be brought to testify or not was the fact that my testimony in view of the fact that I could not exclude a six-day postmortem interval, that *this would merely corroborate prosecution evidence in this particular case and that perhaps it may be in the best interest of the defendant that I not testify.*
>
> \* \* \* \* \* \*
>
> *[I]t was the final decision of Mr. Walrath that my testimony in this case I think primarily would corroborate the prosecution evidence and would, therefore, substantiate the prosecution evidence on time of death and it may be in the best interest of the client that I not testify.*

N.T. 10/3/79 pp. 83, 96 (emphasis supplied). The PCHA court, which heard all the evidence, expressly credited Dr. Sopher's assertion that his testimony would have merely corroborated the Commonwealth's position. Opinion of Williams, P.J., at 6. (Opinion filed April 22, 1980). Not only would Dr. Sopher have fortified the Commonwealth at trial, but he specifically contradicted Mr. Walrath's PCHA testimony as to the reason he was not called. The soundness of Judge Williams' findings on Dr. Sopher's credibility cannot

be faulted by reviewing the synthetic testimony of Mr. Walrath.[8]

The same note of artificiality pervades Mr. Walrath's testimony concerning the contention that there were other exculpatory witnesses who might have been called, including appellant himself, State Trooper John P. George, Deputy Coroner Arthur B. King and "five or six other witnesses" whom Mr. Walrath was unable to identify. N.T. PCHA 8/21/79 p. 59; N.T. PCHA 10/3/79 pp. 20–23.

None of these allegedly exculpatory witnesses was ever produced by appellant during the PCHA proceedings. Appellant has utterly failed to sustain his burden of proving that the testimony of the witnesses would have strengthened the defense. *See Commonwealth v. Robinson*, 292 Pa. 633, 435 A.2d 255 (1981); *Commonwealth v. Pettus*, 492 Pa. 558, 424 A.2d 1332 (1981). In fact, as the PCHA court noted, what evidence there was indicated that the testimony of the allegedly favorable witnesses would have had a harmful effect or no effect at all on the defense.[9]

**8.** It is well-settled that the credibility of witnesses in PCHA proceedings is exclusively within the province of the hearing court. *Commonwealth v. Williams*, 496 Pa. 486, 437 A.2d 1144 (1981); *Commonwealth v. Alston*, 473 Pa. 40, 373 A.2d 741 (1977); *Commonwealth v. Smith*, 454 Pa. 256, 312 A.2d 396 (1973). The hearing court's evidentiary findings are entitled to great weight on appeal. *Id. See also, Commonwealth v. Lee*, 478 Pa. 70, 385 A.2d 1317 (1978); *Commonwealth v. Hauser*, 450 Pa. 388, 299 A.2d 218 (1973).

**9.** Appellant himself, while not actually testifying, presented a closing argument at the second hearing in which he did not indicate in any way how his testimony would have aided the defense. N.T. PCHA 10/3/79 pp. 156–161. Moreover, whatever appellant's testimony might have been, he was not denied the opportunity to offer it at trial.

With regard to Trooper George, the record is barren of any potentially favorable evidence which could have been elicited from him. *See* Opinion of Williams, P. J., p. 6 (Opinion filed April 22, 1980). Furthermore, regarding Dr. King's testimony, Mr. Walrath admitted at the PCHA hearing that Dr. King had changed his opinion by the time of the trial, and agreed with the Commonwealth's expert concerning the time of the victim's death. N.T. PCHA 8/21/79 pp. 95–96.

■ Appellant cannot meet his burden of proof in a PCHA proceeding with the bare assertion by trial counsel that the defense might have been handled differently or that an unsubstantiated defense was not fully presented. *See Commonwealth v. Pettus*, 492 Pa. at 563, 424 A.2d at 1335; *Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 235 A.2d 349 (1967). The lower court properly looked beyond the self-serving statements of appellant and trial counsel, to ascertain if there was any substance to appellant's claim. A thorough review of the evidence presented in the PCHA hearings demonstrates, as the PCHA court explicitly held, appellant's "alleged withheld defense is really no defense at all and trial counsel was not ineffective for failing to present the same." Opinion of Williams, P. J., at 6 (Opinion filed April 22, 1980). *See Commonwealth v. Pettus*, 492 Pa. at 563, 424 A.2d at 1335; *Commonwealth v. Giknis*, 491 Pa. 215, 420 A.2d 419 (1980). Appellant is thus not entitled to relief on his unsupported claim that he was deprived of a material and favorable defense through the ineffectiveness of trial counsel. His contention is without merit simply because, as the record shows and the PCHA court held, the evidence trial counsel deliberately withheld was best left in the closet.

■ Appellant's second contention is that trial counsel was ineffective because he failed to file a motion to dismiss the indictments under Pa.R.Crim.P. 1100, which, at the time appellant was charged, required that trial commence within 270 days of the initiation of a criminal prosecution. In the instant case, the criminal complaint charging appellant with rape and murder was filed on November 20, 1973. At that time, however, appellant was in the custody of New York State authorities, to whom he had surrendered in connection with an assault, which had occurred in New York prior to the events leading to the instant prosecution. The trial court expressly held that appellant was unavailable to Pennsylvania authorities until July 9, 1974, when he consented to extradition after apparently pleading guilty to the New York charges. Due to appellant's unavailability, the period

for Rule 1100 computation did not begin until July 9, 1974. *See Commonwealth v. Morgan*, 484 Pa. 117, 398 A.2d 972 (1979); *Commonwealth v. Cohen*, 481 Pa. 349, 392 A.2d 1327 (1979); *Commonwealth v. Mitchell*, 472 Pa. 553, 372 A.2d 826 (1977); Pa.R.Crim.P. 1100(d). Appellant's trial, which began on November 18, 1974, was well within the 270 day period mandated by Rule 1100. Appellant thus cannot prevail on his Rule 1100 claim.

■ Appellant next attacks his trial counsel's failure to object to allegedly inflammatory remarks made by the prosecutor. Appellant is entitled to no relief on this claim because it was addressed by this Court on appellant's direct appeal. The *very same remarks* challenged here were raised in part IX of appellant's direct appeal brief. *See* Appellant's Direct Appeal Brief at 125–128. There can be no doubt that this Court considered and rejected the claim:

> McKenna alleges some nine trial errors, any one of which, he argues, requires the grant of a new trial. Having carefully reviewed the record, we find merit in none of these claims of error and affirm the convictions of murder and rape.

*McKenna I*, 476 Pa. at 431, 383 A.2d at 176.[10] Appellant cannot seek further review through these PCHA proceedings of a claim which has been fully and finally litigated. *Commonwealth v. Slavik*, 449 Pa. 424, 297 A.2d 920 (1972). *See also, Sanders v. United States*, 373 U.S. 1, 15, 83 S.Ct. 1068, 1077, 10 L.Ed.2d 148 (1963).

**10.** We identified the issues on direct appeal more completely in a footnote:

> In appellant's brief the following nine issues are raised: (1) the indictment was improper; . . . and (9) the special prosecutor was guilty of misconduct. We see no jurisprudential need to discuss any of these assertions of error in this opinion.
>
> Additionally, we have an independent responsibility to review the evidence to determine whether the record is sufficient to support a finding of murder in the first degree. . . . This we have done and are satisfied there is sufficient evidence to support the verdict.

*Commonwealth v. McKenna*, 476 Pa. 428, 431–32 n.3, 383 A.2d at 174, 176 n.3 (1978).

■ Appellant's final claim is that a new trial is required due to evidence discovered after his original trial. Appellant contended at the PCHA hearing that he could produce two witnesses who would testify that a Commonwealth witness had partially recanted his trial testimony in their presence. A third witness would have stated that he had seen a blouse similar to the victim's near where the same Commonwealth witness had been staying. The PCHA court refused to allow this impeachment testimony on the grounds that the allegedly recanting Commonwealth witness had not been shown to be unavailable.[11]

The PCHA court correctly recognized that appellant's proffered testimony would not have passed muster under the three-pronged test articulated by this Court for after-discovered evidence:

> [T]he evidence must have been discovered after the trial and must be such that it could not have been obtained at the trial by reasonable diligence, must not be cumulative or merely impeach credibility, and must be such as would likely compel a different result.

*Commonwealth v. Schuck*, 401 Pa. 222, 229, 164 A.2d 13, 17 (1960), *cert. denied*, 368 U.S. 884, 82 S.Ct. 138, 7 L.Ed.2d 188 (1961). *See also Commonwealth v. Swanson*, 432 Pa. 293, 248 A.2d 12 (1968), *cert. denied*, 394 U.S. 949, 89 S.Ct. 1287, 22 L.Ed.2d 483 (1969). Appellant thus is not entitled to a new trial on the grounds of after-discovered evidence.

We have considered fully appellant's arguments and have reviewed thoroughly the record of these proceedings. We find that none of appellant's claims warrant the grant of a new trial. Accordingly, we vacate our order of January 29, 1982 and affirm the order of the PCHA court.

ROBERTS, J., files a dissenting opinion, in which O'BRIEN, C. J., joins.

FLAHERTY, J., files a dissenting opinion.

11. In fact, appellant assumed the Commonwealth witness was available, but chose not to call him to testify. *See* Appellant's Brief at 25.

ROBERTS, Justice, dissenting.

Trial counsel's failure to object to the prosecutor's prejudicial closing argument requires that appellant be granted a new trial.

In his closing, the prosecutor said to the jury:

"[L]et me tell you this, there is only one way, one way that you can find that man [(the defendant)] not guilty and that is if that door opens and Sharron Coston [(the victim)] walks in and sits down right next to her mother right now.  Shall we wait?"

This prosecutorial tactic, of directing the jury's attention to the rear of the courtroom to await the "arrival" of the deceased victim, is perhaps the most offensive tactic which has been subject to this Court's review over the past decade. This tactic has necessitated the vacation of numerable judgments of sentence.  E.g., *Commonwealth v. Cronin*, 464 Pa. 138, 346 A.2d 59 (1978); *Commonwealth v. Lark*, 460 Pa. 399, 333 A.2d 786 (1975).  See *Commonwealth v. Lipscomb*, 455 Pa. 525, 317 A.2d 205 (1974).  Moreover, it is a tactic which this Court has repeatedly held to be so inherently prejudicial as to require defense objection.  See, e.g., *Commonwealth v. Black*, 480 Pa. 394, 390 A.2d 750 (1978); *Commonwealth v. Evans*, 479 Pa. 100, 387 A.2d 854 (1978).  "Trial counsel could not have had a reasonable basis designed to effectuate [his client's] interests when he failed to object to [these] prejudicial and inflammatory remarks." *Commonwealth v. Black*, supra, 480 Pa. at 397, 390 A.2d at 750.

Despite appellant's entitlement to relief, the majority deems appellant's contention "finally litigated" solely on the basis of the following passage from the Opinion of the Court filed upon the disposition of appellant's direct appeal:

"McKenna alleges some nine trial errors, any one of which, he argues, requires the grant of a new trial. Having carefully reviewed the record, we find merit in none of these claims of error . . . ."

476 Pa. 428, 431, 383 A.2d 174, 176 (1978).  Although the record establishes that appellant had indeed sought this Court's review of the prosecutor's prejudicial tactic, the

record also establishes that appellant had failed to comply with the mandates of *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1974) (timely objection required to preserve claims of error for appellate review). Thus, when in this case the Opinion of the Court stated that there was "no merit" to appellant's claim of prosecutorial misconduct, it must be concluded that that disposition meant *only* that appellant could not prevail on the claim because of its improper procedural posture.

As in *Black* and in *Evans*, where trial counsel failed to interpose objection in the face of an identical prosecutorial tactic, appellant must be granted relief.

O'BRIEN, C. J., joins in this dissenting opinion.

FLAHERTY, Justice, dissenting.

I dissent. Trial counsel is alleged to have been ineffective for failing to present certain testimony favorable to the defense. Specifically, the available, albeit omitted, testimony consisted of, *inter alia*, the opinion of a forensic pathologist, Dr. Sopher, indicating that *no scientific evidence, collected from the victim's body or from the crime scene, identified appellant as having committed the rape and murder in question.* The opinion authored by Mr. Justice McDermott omits mention of this, the primary reason to have called Dr. Sopher to testify, and creates the impression that Dr. Sopher would have testified only as to the time of the victim's death. In the PCHA hearing, appellant's trial counsel testified as follows regarding his reasons for not presenting certain witnesses on behalf of the defense.

Q. [W]as one of the other factors you considered the nature of Dr. Sopher's testimony?

A. No.

Q. Was it not a fact that Dr. Sopher could not establish a specific time of death but only give you a range as Dr. Catherman had already indicated?

A. I think on the issue on the time of death Dr. Sopher's testimony would have been helpful to the defendant. I think it would have contradicted the testimony of the

Commonwealth. I did not believe ... that Dr. Sopher's testimony would be strong enough to overcome the effect on the jury of the court's ruling not only on the prior crimes but other rulings throughout the case.... *I felt that the defendant was protected enough on the record* that it would be *useless to present a case on his behalf* because I don't think it would have done any good.... *I thought the record was replete with errors* by the court that were prejudicial to the defendant that would deny him the right to a fair trial and *it was senseless and useless to go on.* That is exactly the basis of why we didn't call Dr. Sopher or any of the other witnesses.

   *  *  *  *  *  *

Q. [A]s of the time the Commonwealth completed its case was it your judgment that there was so much error on the record that a conviction could not stand up on appeal?

A. It was my judgment, yes.

   *  *  *  *  *  *

Q. You're saying then you quit?

A. It's not a question of quitting. It's making a conscious decision not—

Q. Not to fight?

A. Not to put on an affirmative defense because the law does not require it. The Court has made so many errors, let the record stand the way it is. Maybe somebody will read the record. Maybe somebody will see the errors that were committed.

Q. Did you see any advantage to Mr. McKenna in not presenting a full defense?

A. *I thought that the less the record was cluttered up by the defense by Mr. McKenna the more chance the Supreme Court would have to read the actual errors* committed and discuss them and come to a ruling on them.

Q. In other words you felt that a more extensive or complicated defense might cloud the issues that were already established. Is that what you're saying?

A. That's correct.

\* \* \* \* \* \*

Q. Would it be accurate to say you felt that his best chance of an ultimate acquittal was a reversal in that case and a new trial under other circumstances?

A. *My aim was not so much acquittal,* my aim was to protect Mr. McKenna's rights and see that he got a fair trial and when I reached the point where I felt he was not being given a fair trial and there was nothing more I could do to see that he got a fair trial, I felt the Court and everybody else was entitled to us taking the position *we're going to stop right here.*

\* \* \* \* \* \*

Q. And you felt that way because you felt in that way you could best preserve the uncluttered record for appeal. Is that right?  If in fact he was convicted.

A. Well, I felt there was no question we'd get a new trial.  I don't know about cluttering up the record.  *I just didn't want to waste any more time.  I felt that the trial was a complete waste of time* and I so conveyed my feelings to Mr. McKenna, and he had conveyed them to me on numerous occasions throughout all the proceedings.

\* \* \* \* \* \*

Q. Did you just say to him, Mr. McKenna, there's nothing we can do.  Let's stop putting on a defense?

A. I said, Mr. McKenna, as far as I'm concerned right now they're going to find you guilty. . . .  I don't want to be sacrilegious but I don't think if the Good Lord himself took the stand right now that jury would find you not guilty.  *They've got this thing so screwed up, there's been so many errors and so many mistakes made in this case that there's nothing the jury can do.*

(Emphasis added.)

In short, trial counsel decided that the trial was so unfair that any conviction resulting therefrom would be reversed on appeal and that it was, therefore, futile to proceed with a defense directed at achieving an acquittal, which, in view of

the errors alleged, counsel perceived to be unattainable. In so doing, however, counsel presumed to know what the effect upon the jury would be of the evidence which he refrained from presenting, thereby denying appellant the benefit of having testimony considered by the jury. This evidence, although perhaps not determinative of guilt, would nevertheless have contributed to the defense's position. Trial counsel articulated no legitimate tactical reason for the failure to present the testimony in question, and counsel provided ineffective representation by, in effect, taking it upon himself to terminate the trial while elevating his judgment to that of an appellate court in evaluating the ramifications of the errors alleged.[1]

---

1. The situation presented in this case is not one where counsel, after consideration of *recognized* tactical alternatives, determined that certain witnesses should not be called to testify. Counsel's realm of discretion over the choice of tactics employed is broad, and that discretion necessarily includes the exercise of judgment about whether the presentation of particular witnesses' testimony would, considering all relevant factors, be beneficial to the client's case. *See Commonwealth v. Spells*, 490 Pa. 282, 288, 416 A.2d 470, 473–474 (1980).