J-A05036-22

2022 PA Super 97

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| WILLIAM R. LANDIS JR. | : | No. 611 MDA 2021 |

Appeal from the Order Entered April 16, 2021
In the Court of Common Pleas of Berks County Criminal Division at
No(s): CP-06-CR-0005405-2009

BEFORE:  OLSON, J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:                **FILED MAY 26, 2022**

The Commonwealth of Pennsylvania appeals from the order of the Court of Common Pleas of Berks County granting Appellee William R. Landis, Jr.'s post-sentence motion and awarding him a new trial.  The Commonwealth argues the trial court abused its discretion in finding that Landis was entitled to a new trial based on his claim that the jury's verdict was against the weight of the evidence.  We reverse the trial court's order granting a new trial and reinstate the judgment of sentence entered on November 12, 2020.

The procedural history of this case is rather extensive as this case has been heavily litigated over more than a decade, and this is the seventh appeal before this Court.  Landis was charged with first-degree murder, third-degree murder, and two counts of aggravated assault in connection with the October 28, 2009 shooting death of his wife, Sharon Landis ("the victim").  In addition,

_____

[*] Former Justice specially assigned to the Superior Court.

Landis was charged with one count of Assault of a Law Enforcement Officer, multiple counts of aggravated assault, and related crimes in connection with Landis's conflict with police as they attempted to take him into custody after finding the victim had been fatally shot.[1]

After Landis's first jury trial began on April 1, 2013, the jury convicted Landis of first-degree murder, but acquitted him of the remaining murder charge. On May 15, 2013, Landis was sentenced to life imprisonment without parole.[2] Landis appealed the judgment of sentence which this Court affirmed on April 10, 2014. **Commonwealth v. Landis**, 1018 MDA 2013, 2014 WL 10936726 (Pa.Super. April 10, 2014) (unpublished memorandum).

On December 22, 2014, Landis filed a petition for relief pursuant to the Post-Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546. On December 21, 2015, the PCRA court granted Landis a new trial based on his claim that trial counsel was ineffective in failing to present expert testimony to support a diminished capacity defense. On appeal, this Court affirmed the PCRA

---

[1] On April 14, 2010, after considering Landis's pretrial motions, the trial court dismissed the charge of Assault of a Law Enforcement Officer and severed the remaining charges related to his conflict with law enforcement. After the Commonwealth filed an interlocutory appeal, this Court ultimately reinstated the charge of Assault of a Law Enforcement Officer. **Commonwealth v. Landis**, 48 A.3d 432 (Pa.Super. 2012) (*en banc*).

[2] At sentencing, the parties agreed the Commonwealth would withdraw the charge of Assault of a Law Enforcement Officer since Landis was sentenced to life imprisonment so long as the Commonwealth would be allowed to reinstate the charge if Landis was ever granted a new trial. Thus, the trial court dismissed the charge of Assault of a Law Enforcement Officer.

court's order on November 30, 2016 and the Supreme Court denied the Commonwealth's petition for allowance of appeal on July 24, 2017. *Commonwealth v. Landis*, 28 MDA 2016, 2016 WL 6995387 (Pa.Super. November 30, 2016) (unpublished memorandum); *Commonwealth v. Landis*, 169 A.3d 1059 (Pa. 2017).[3]

On September 8, 2020, Landis's second trial commenced on the first-degree murder charge,[4] and the parties presented extensive testimony over a five-day period.

On October 28, 2009, Landis contacted the Spring Township Police to report that his wife had been shot and then hung up the phone. Notes of

_____

[3] On August 28, 2017, the Commonwealth filed a motion to reinstate the charge of Assault of a Law Enforcement Officer as well as the third-degree murder charge and aggravated assault charges. Landis did not oppose the reinstatement of Assault of a Law Enforcement Officer charge but claimed the other charges could not be reinstated as double jeopardy applied.

On October 14, 2017, the trial court entered an order denying the Commonwealth's motion to reinstate the charges of third-degree murder and aggravated assault. On December 24, 2018, this Court affirmed the trial court's decision. *Commonwealth v. Landis*, 201 A.3d 768 (Pa.Super. 2018). This Court denied reconsideration on January 7, 2019, the Pennsylvania Supreme Court denied the Commonwealth's petition for allowance of appeal on September 4, 2019, and the Supreme Court of the United States denied *certiorari* on March 2, 2020.

[4] Prior to trial in this case, on February 22, 2020, the trial court granted Landis's pretrial motion to dismiss the charge of Assault of a Law Enforcement Officer pursuant to Pa.R.Crim.P. 600. After the Commonwealth appealed that ruling, the parties proceeded to trial on the first-degree murder charge of which Landis was convicted in the instant case. Thereafter, on December 17, 2020, this Court vacated the trial court's order dismissing the charge of Assault of a Law Enforcement Officer and remanded for trial. *See Commonwealth v. Landis*, 501 MDA 2020, 2020 WL 7396932 (Pa.Super. December 17, 2020) (unpublished memorandum).

Testimony (N.T.), 9/8/20 – 9/16/20, at 249-51, 319, 463. When the officers arrived at Landis's home, they found the deceased victim's body on the floor of a second-floor bedroom and noted she had sustained gunshot wounds to the head and chest. N.T. at 256-58. Officers noticed a bullet shell casing laying in a laundry basket next to the victim. N.T. at 258.

The officers were startled to find Landis had barricaded himself in the basement, and Landis told the officers that he would kill them if they came downstairs to get him. N.T. at 259-62. When officers indicated that they were going to get a canine officer, Landis appeared at the basement steps, pointed a gun to his own head, and reiterated that he would shoot any officer that tried to come down into the basement. N.T. at 262.

Detective Stephen Brock stayed at the top of the basement stairs and spoke with Landis from a distance for four or five hours, during which Landis identified himself and his wife, who was the victim found in the upstairs bedroom. N.T. at 264, 271. Landis explained that he and his wife had an argument, she threatened to kill him, Landis grabbed a firearm, and accidentally shot her. N.T. at 265.

Detective Brock noticed Landis had at least two firearms in the basement and Landis pointed a gun at Detective Brock on several occasions. N.T. at 265-269. When Detective Brock asked Landis to put the gun down, Landis refused to do so and retreated from the detective's sight. Landis agreed to surrender numerous times, but then would continue to delay doing

so for various reasons, indicating he had to make phone calls, find jewelry to be given to a family member, and put on new clothes. N.T. at 270-276.

The responding officers sought the additional assistance of the Berks County SWAT team (BCERT). N.T. at 261, 327. Several hours into the encounter, when Landis appeared unarmed at the bottom of the stairs, the BCERT team fired a foam round at Landis's stomach and descended quickly down the stairs to attempt to take Landis into custody using a Taser. N.T. at 377-78, 422, 423. However, when the Taser was not deployed successfully, Landis grabbed a firearm and fired two shots, causing the BCERT members, who were not injured, to run back up the stairs. N.T. at 378, 422-24.

After the standoff which lasted several hours, Landis eventually surrendered and was taken into custody. N.T. at 277-78. Upon his arrest, officers recovered two handguns (one of which was loaded) and a large knife from the basement. N.T. at 561-62.

Detective Brock testified that when he initially began speaking with Landis in the basement, Landis did not display any indication of intoxication. N.T. at 274-75. Detective Brock was able to maintain a conversation with Landis and had no trouble understanding him. N.T. at 274-75. However, as the night progressed, Landis informed Detective Brock he was "drinking something." N.T. at 275. Detective Brock noted that Landis was becoming more tired and he started to slur his speech, but Detective Brock was always able to understand what Landis was saying. N.T. at 275-76. Landis later admitted that he took a sleeping pill during the standoff. N.T. at 1076-77.

Upon his arrest, officers transported Landis to the hospital where he was treated for cuts on his hand and a bruise on his abdomen that Landis sustained when he was struck by the foam round. N.T. at 333, 443. One of the officers noted Landis smelled of alcohol, his speech was "a bit slurred," and he appeared to be tired. N.T. at 557. However, Landis was able to carry on conversations with officers, his attorney, ambulance personnel, and hospital staff. N.T. at 334-35, 345, 481-85.

Dr. Supriya Kuruvilla, a forensic pathologist, performed the victim's autopsy and determined the cause of her death was the gunshot wound to her head. N.T. at 748. Based on the characteristic marks of the victim's wounds and stippling near the wounds,[5] Dr. Kuruvilla was able to determine that the bullet that entered the left side of the victim's head was shot from approximately two feet away. N.T. at 749-52. Dr. Kuruvilla noted the victim also suffered a gunshot wound to the chest, in which the bullet entered her left breast, passed through both breasts, and exited her body. N.T. at 753. In addition, Dr. Kuruvilla noticed stippling on the victim's right forehead and palm which were unrelated to the two other gunshot wounds but raised the possibility that another gunshot was fired that did not hit the victim. N.T. at 754-55. The toxicology report showed the victim did not have alcohol or drugs in her body at the time of her death. N.T. at 764-66.

---

[5] Dr. Kuruvilla explained that stippling is a term that forensic pathologists use to describe unburnt particles of gunshot residue that gets deposited on the skin in characteristic patterns. N.T. at 750.

In the bedroom where the victim's body was found, officers discovered three spent .380 caliber shell casings and an empty .380 caliber magazine. N.T. at 837-42. Officers noted bullet holes in the bedroom wall and a defect in a laundry basket consistent with a .380 projectile going through it. N.T. at 836, 843-49. Officers also recovered a spent .380 caliber casing from the basement as well as a bottle of vodka with Landis's fingerprints on it. N.T. at 875-877. Ballistics testing determined that all four casings were fired from the .380 caliber firearm that was seized from the basement. N.T. at 561-62, 924-926. Additionally, DNA testing revealed that the victim's DNA was not found on either of the firearms but Landis's DNA was found on the weapon that fired the fatal shots. N.T. at 928-29, 1053-54.

The prosecution presented the testimony of Robert Johnson, who was qualified as an expert witness in latent fingerprint examination, blood spatter analysis, and crime scene reconstruction. N.T. at 827. In October 2009, Mr. Johnson was employed as a Berks County detective and assisted in collecting evidence at the crime scene. Based on the aforementioned evidence and statements that Landis made to the defense psychiatrist about the shooting (which will be discussed *infra*), Mr. Johnson opined that three separate shots had been fired from the .380 caliber weapon, the first hitting the laundry basket, the second passing through the victim's breasts, and the third passing through the victim's head. N.T. at 933-951.

In an attempt to provide context to the events that led to the victim's death on October 28, 2009, the prosecution presented the testimony of two

women, Jamie Brown and Cheryl Johnson, who worked at the Beachcomber Resort in Pompano Beach, Florida, where Landis had spent several weeks in September 2009, weeks before the victim's death. Both women indicated that Landis had shared personal information with them during his stay.

Ms. Brown, a bartender, testified that Landis had confided in her that he was not happy in his marriage and wanted a divorce from his wife because she had gained weight and was not maintaining herself as he would have liked. N.T. at 496-97. Ms. Brown indicated that Landis had expressed a desire to marry her upon his divorce, although Landis and Ms. Brown did not have a romantic relationship. N.T. at 501. Landis gave Ms. Brown a $2,000 tip upon leaving the resort. N.T. at 498.

Ms. Johnson, another Beachcomber Resort employee, similarly testified that Landis confided in her during his September 2009 stay. Ms. Johnson recalled Landis had indicated that his "marriage was pretty much over" and Landis was "obsessed" about the financial aspect of his imminent divorce as he did not want to lose his home to his wife. N.T. at 522-53. Ms. Johnson indicated Landis offered her a condo and desired an intimate relationship with her, but she declined. N.T. at 520-21, 529. Ms. Johnson shared that Landis gave her a $4,800 tip upon leaving the resort. N.T. at 525.

On the night of the victim's murder, Landis called Ms. Brown and told her that his wife was dead, and said "I killed my wife; someone killed my wife; I want to kill myself." N.T. at 499. Ms. Brown recalled Landis sounded drunk on that call. Thereafter, Ms. Brown told Ms. Johnson to call Landis. When she

did so, Landis told Ms. Johnson that he shot his wife accidentally during an argument when they struggled for a firearm. N.T. at 527-28.

The prosecution also presented evidence that the victim stayed at a hotel on the night before her death. N.T. at 538. James Sieck, general manager of Homewood Suites, testified that the victim booked a room on October 27, 2009 and directed hotel staff that she did not want to receive any calls during her stay. N.T. at 539. Mr. Sieck testified that Landis called over twenty times asking to speak to the victim, but hotel personnel told him they could not help him. N.T. at 542. In the morning, Landis arrived at the hotel and asked to see the victim, but hotel personnel refused to give him access to the victim. N.T. at 539-45.

Connie Landis, daughter of Landis and the victim, also testified for the prosecution. Connie indicated that her parents were having an "intense argument" on the night of the murder about accusations that the victim had been cheating on Landis. N.T. at 679-82. Connie left the house when she was unable to stop the argument. N.T. at 670, 683. Connie indicated that Landis sent Connie a text at 8:43 p.m. during the argument before Connie left the house and sent her another text at 9:31 p.m. to tell Connie that he had shot her mother. N.T. at 683-688.

In response, the defense presented multiple witnesses in support of its theory that Landis shot the victim in self-defense during a heated argument. In addition, the defense claimed that Landis could not have formed specific intent to kill the victim as he was intoxicated.

The defense presented the testimony of Patricia Pieja, who testified that on October 20, 2009, a week before the victim's death, the victim called her crying from the bathroom of a restaurant where she had gone with Landis for her birthday and had engaged in an argument with Landis. N.T. at 1025. Ms. Pieja recalled that the victim was very angry and said that she was going to kill Landis. N.T. at 1025.

The couple's son, William Landis, III, testified that he was at his parents' house the night of the murder. N.T. at 1032. When William left the house at approximately 8:20 p.m., he noted Landis had a smell of alcohol on his breath, but Landis was not slurring his words. N.T. at 1034-35. William admitted neither of his parents were agitated when he left their home. N.T. at 1037. The couple's other daughter, Barbara Landis, received several calls from Landis on the night of her mother's death. N.T. at 1043-44. Barbara recalled hearing police officers in the background and noted that her father sounded panicked and his speech was difficult to understand. N.T. at 1044-45.[6]

The defense also offered the testimony of Dr. Larry Rotenberg, who was qualified as an expert in forensic psychiatry. N.T. at 1068. Dr. Rotenberg conducted psychiatric evaluations of Landis in 2010 and 2018, during which he administered psychological tests to Landis. N.T. at 1073-74. In addition, Dr. Rotenberg reviewed police reports, family interviews, and Landis's medical

---

[6] Barbara claimed that, after the investigation was complete, she found a shell casing in the bedroom where the victim was shot. The shell casing was not admitted into evidence or discussed by the defense. N.T. at 1047.

records from the hospital the morning of his arrest and also from the Berks County prison. N.T. at 1072-75. Dr. Rotenberg focused on the fact that Landis's blood test on the morning after the victim's murder showed he had a blood alcohol level (BAC) of .23 and the test also revealed the presence of cocaine. N.T. at 1076. Dr. Rotenberg pointed out Landis's BAC was likely higher upon his arrest over an hour earlier. N.T. at 1076.

Based on this information, Dr. Rotenberg opined that Landis did not have the mental capacity to form a specific intent to kill the victim, but rather was operating under a diminished capacity. N.T. at 1075. Further, Dr. Rotenberg made a diagnosis that, during the time of his stand-off with police, Landis experienced a brief psychotic disorder that was brought on by the stress of the victim's death. N.T. at 1078-82.

On cross-examination, the prosecutor presented Dr. Rotenberg with his expert report in which he recorded Landis's account of the events that occurred immediately prior to the victim's death. Dr. Rotenberg documented that Landis had claimed to be in his daughter's bedroom fixing her phone when he initiated a conversation with the victim about the possibility of divorce. N.T. at 1089. Dr. Rotenberg indicated in his report that Landis recalled that the victim "blew up" and attacked him after Landis informed the victim of the amount of alimony he planned to give her and the retainer fee his attorney was going to charge for the divorce. N.T. at 1091.

Dr. Rotenberg acknowledged that he reviewed the expert report of the prosecution's forensic psychiatrist, Dr. John O'Brien, who found Landis had

the capacity to form specific intent to kill the victim, as he had engaged in intentional acts at the time of the victim's death in fixing a phone, engaging the victim in a conversation about the financial aspects of a proposed divorce, and calling 911 after the victim had been shot. However, Dr. Rotenberg asserted that consideration of Landis's rational acts before the victim's death did not change his expert opinion that Landis was so intoxicated that he lacked the capacity to form the specific intent to kill the victim. N.T. at 1101-1109.

In addition, while Landis's blood tests showed a BAC of .23 and the presence of cocaine at 6 a.m. on the morning of October 29, 2009, more than ten hours after the victim had been shot the previous evening, Dr. Rotenberg admitted there was no way to tell if Landis drank the alcohol and/or snorted the cocaine before the victim's death or during his subsequent standoff with police which had lasted multiple hours. N.T. at 1114-1115.

In rebuttal, the prosecution presented the testimony of Dr. John O'Brien, who was also qualified as an expert in forensic psychiatry. N.T. at 1132-35. In forming his opinion, Dr. O'Brien conducted a clinical interview with Landis and conducted a cognitive capacity screening examination to look for evidence of brain damage. In addition, Dr. O'Brien reviewed investigative materials related to the victim's death, Landis's medical records from the hospital and prison, and Dr. Rotenberg's reports. N.T. at 1136-38.

Dr. O'Brien specifically noted that he was not expressing an opinion on whether Landis had the intent to kill, which he acknowledged was a question for the jury to determine. N.T. at 1139-40. However, Dr. O'Brien opined that

Landis was capable of forming the intent to kill the victim at the time of her death.  N.T. at 1140.

In reaching this conclusion, Dr. O'Brien observed that Landis had no symptoms of any psychiatric condition or cognitive impairment.  N.T. at 1141. Dr. O'Brien acknowledged Landis had a history of using alcohol and cocaine but noted that it did not appear to rise to the level of a substance abuse disorder as his drug use did not impair his daily life functioning or his ability to serve as the owner and director of a successful trucking company.  N.T. at 1141-42.

Dr. O'Brien testified that it was not appropriate for Dr. Rotenberg to diagnose Landis as having a brief psychotic disorder that caused Landis to react violently towards the arresting officers as Landis did not exhibit psychotic symptoms, and further, the psychological diagnostic manual requires the exclusion of drug/alcohol use before this diagnosis is made.  N.T. at 1142-43.

Dr. O'Brien emphasized that Landis's behavior near the time of the victim's death reflected that he was capable of formulating and carrying out intentional tasks, such as fixing his daughter's phone, engaging the victim in a conversation about the financial aspects of their divorce, being fully aware that there was a gun in the room where the victim was shot, calling 911, and making numerous phone calls thereafter.  N.T. at 1145-46.

However, Dr. O'Brien suggested there was "documentation in the investigative interviews" that Landis discussed with two witnesses in Florida his "intention to kill his wife in the weeks proceeding the offense" and told

them "he was going to kill his wife." N.T. at 1146. Notably, the defense did not object or cross-examine Dr. O'Brien as to the accuracy of this statement.[7]

After the trial concluded on September 16, 2020, the jury convicted Landis of first-degree murder. On November 12, 2020, Landis was sentenced to life imprisonment without the possibility of parole.

On November 23, 2020, Landis filed a post-sentence motion seeking a new trial. Specifically, Landis claimed that he was entitled to a judgment of acquittal as the Commonwealth had not met its burden to present sufficient evidence to show that he had the specific intent to kill the victim.

In the alternative, Landis asked the trial court to grant a new trial as the jury's verdict was not supported by the weight of the evidence. Specifically, Landis asked the trial court to give more weight to the testimony of Dr. Rotenberg than the testimony of Dr. O'Brien, which Landis deemed to be speculative, as Dr. O'Brien had incorrectly stated that Landis had told Ms. Brown and Ms. Johnson in Florida before the victim's death that he planned to kill his wife.

On January 19, 2021, the Commonwealth filed a response to Landis's post-sentence motion indicating that it had presented sufficient evidence of Landis's specific intent to kill, given that he had fired multiple shots at the

---

[7] It is important to note that when Dr. O'Brien testified, the jury had already heard the testimony of Ms. Brown and Ms. Johnson, the two female witnesses from Florida. Therefore, at this point in the trial, the jury knew precisely what the women had told police in their pre-trial interviews and in their trial testimony recalling the relevant events.

victim, used a deadly weapon on vital parts of the victim's body, only Landis's DNA was found on the firearm in question, and Landis showed consciousness of guilt in threatening and shooting at the police when they attempted to take him into custody.

With respect to the weight of the evidence claim, the Commonwealth indicated that the jury was free to weigh the competing opinions of the testifying experts to determine which expert testimony to believe and how much weight to give to each expert opinion. The prosecutor stated that Dr. O'Brien was honestly mistaken in testifying that Landis had discussed his intent to kill the victim with other individuals before her death, and the prosecutor argued that this inaccurate statement was not sufficient to overturn the jury's verdict in this case.

On April 16, 2021, the trial court entered its order granting Landis's post-sentence motion and awarding a new trial. In reviewing Landis's challenge to the weight of the evidence, the trial court decided Dr. O'Brien had given false testimony and that Dr. O'Brien's expert opinion was rendered incompetent when he testified to facts not supported by the record.

That is, the trial court was referring to Dr. O'Brien's inaccurate testimony as to Ms. Brown and Ms. Johnson, the two Florida resort employees, who had not testified that Landis had told them he planned to kill his wife. As such, the trial court substituted its own conclusions of Dr. O'Brien's credibility for that of the jury by stating Dr. O'Brien "misled the jurors with lies, speculation, and undocumented opinions," adding the trial court's own conclusion that "the

jurors were unable to make a knowing decision based on the facts, the evidence, and the expert reports." Trial Court Opinion, 4/16/21, at 19.

The Commonwealth filed a timely appeal and complied with the trial court's direction to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), in which it raised the following claim:

> The Trial Court respectfully erred in granting the post-sentence motion and awarding a new trial where the weight of all evidence presented at trial by the Commonwealth including the psychiatric testimony presented on rebuttal by Dr. John O'Brien, was sufficient to support the conviction for Murder in the First Degree, 18 Pa.C.S.A. § 2502(a).

Concise Statement, at 1.

We first address Landis's argument that the Commonwealth waived its argument that the trial court abused its discretion in granting Landis's post-sentence motion raising a weight of the evidence claim. Landis asserts the Commonwealth's concise statement was too vague and did not concisely identify the error that it intended to raise on appeal with sufficient detail to allow the trial court to address it.

It is well-established that "[a]ny issues not raised in a 1925(b) statement will be deemed waived." *Commonwealth v. Laboy*, 230 A.3d 1134, 1138 (Pa.Super. 2020) (quoting *Commonwealth v. Lord*, 719 A.2d 306, 309 (Pa. 1998)). In addition, "when an appellant fails adequately to identify in a concise manner the issues sought to be pursued on appeal, the trial court is impeded in its preparation of a legal analysis which is pertinent to those issues." *Commonwealth v. Dowling*, 778 A.2d 683, 686 (Pa.Super.

2001) (stating "[w]hen a court has to guess what issues an appellant is appealing, that is not enough for meaningful review").

Our Supreme Court addressed a similar claim in its recent decision in ***Commonwealth v. Rogers***, 250 A.3d 1209, 1224–25 (Pa. 2021):

> In all events, it bears noting that the purpose of Rule 1925 is to facilitate appellate review and to provide the parties and the public with the legal basis for a judicial decision. ***See Commonwealth v. Parrish***, ––– Pa. ––––, ––––, 224 A.3d 682, 692 (2020) (quoting ***Commonwealth v. DeJesus***, 581 Pa. 632, 638, 868 A.2d 379, 382 (2005)). If that basis is evident from the record, the trial court need not issue an opinion explaining it. *See* Pa.R.A.P. 1925(a) (requiring an opinion only where "the reasons for the order [appealed from] do not already appear of record"). The function of the concise statement is to clarify for the judge who issued the order the grounds on which the aggrieved party seeks appellate review – so as to facilitate the writing of the opinion. *See* Pa.R.A.P. 1925(b) ("If the judge entering the order giving rise to the notice of appeal ... desires clarification of the errors complained of on appeal, the judge may enter an order directing the appellant to file of record ... a concise statement of the errors complained of on appeal[.]").
>
> In ***Commonwealth v. Laboy***, 594 Pa. 411, 936 A.2d 1058 (2007) (*per curiam*), this Court faced a situation comparable to the present controversy. The defendant's Rule 1925(b) statement was exceedingly brief in setting forth an evidentiary-sufficiency claim. Nevertheless, the common pleas court issued a Rule 1925(a) opinion resolving the claim on its merits. The Superior Court found the claim waived due to its brevity and did not address its merits. This Court held that the Superior Court should have afforded the requested sufficiency review, as the trial transcript was short, it was fairly evident from context that the sole legal issue was whether the defendant was vicariously liable for his co-defendant's actions, and "the common pleas court readily apprehended Appellant's claim and addressed it in substantial detail." ***Id***. at 415, 936 A.2d at 1060.
>
> Here, the trial transcript is admittedly much longer than in ***Laboy***. Nevertheless, the weight-of-the-evidence claim was readily understandable from context. Appellant's theory, for which

he provided his own supporting testimony, was that he was innocent of all charges in relation to the three adult victims because he did not physically attack or steal from any of them, and his intercourse with all of them was consensual. Further, and as noted, in his post-sentence motion Appellant articulated the evidentiary-weight claim at some length as to the three adult victims, and those were the same individuals he mentioned in his Rule 1925(b) statement. The common pleas court summarized the victims' credited testimony contradicting Appellant's theory and determined that the verdicts were not contrary to the weight of the evidence. Thus, as in *Laboy*, the trial court had no difficulty apprehending the claim as set forth in the concise statement and addressing its substance.

This latter circumstance is particularly salient because, as explained, the concise statement's purpose is to assist the trial judge in apprehending the issues and authoring an opinion accordingly for the benefit of the parties, the appellate court, and the public. If a concise statement's explanation of a particular issue is overly long, moreover, the appellant runs the risk of invoking the waiver rule on that basis. *See* Pa.R.A.P 1925(b)(4)(iv) (prohibiting "lengthy explanations as to any error"); 1925(b)(4)(vii) (providing, among other things, that failure to raise issues in accordance with paragraph (b)(4) results in waiver); 1925(b)(4)(ii) (mandating issues be stated concisely); *cf.* ***Eiser v. Brown & Williamson Tobacco Corp.***, 595 Pa. 366, 384 n.19, 938 A.2d 417, 428 n.19 (2007) (plurality) (observing that Rule 1925 as revised "now explains that frivolous or redundant issues continue to provide grounds for waiver, and clarifies that a lengthy explanation of the claimed error(s) should not be provided in the statement").

In light of these principles, we find that the brevity of Appellant's weight-of-the-evidence claim as set forth in his concise statement represents a good-faith attempt to comply with Rule 1925's concision requirement, and that it did not prevent meaningful appellate review. That being the case, the intermediate court should have considered the claim on its merits. *Accord* ***Commonwealth v. Smyser***, 195 A.3d 912, 916 (Pa.Super. 2018) (applying ***Laboy*** to reach an issue set forth in a "boilerplate" concise statement where the trial court readily apprehended the issue).

***Rogers***, 250 A.3d at 1224–25.

Similarly, in this case, the Commonwealth's weight of the evidence claim was easily understandable from context. The Commonwealth challenged the trial court's decision to award Landis a new trial after it had granted Landis's post-sentence motion which asserted that his first-degree murder conviction was against the weight of the evidence.

The Commonwealth filed a response to Landis's post-sentence motion and contested Landis's suggestion that the entirety of Dr. O'Brien's testimony was not worthy of belief based on his incorrect statement as to Ms. Brown and Ms. Johnson. The trial court found Landis was entitled to a new trial on the weight of the evidence claim on the grounds that it found Dr. O'Brien's expert testimony was incompetent. As the Commonwealth's concise statement has not impeded meaningful review, we decline to find the Commonwealth's weight of the evidence claim waived.

The following principles are applicable to a challenge to the weight of the evidence:

> "A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. **Commonwealth v. Widmer**, 560 Pa. 308, 319, 744 A.2d 745, 751–52 (2000); **Commonwealth v. Brown**, 538 Pa. 410, 435, 648 A.2d 1177, 1189 (1994). A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. **Widmer**, 560 Pa. at 319–20, 744 A.2d at 752. Rather, "the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.'" **Id.** at 320, 744 A.2d at 752 (citation omitted). It has often been stated that "a new trial should be awarded when the jury's verdict is so contrary to the evidence as

to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Brown*, 538 Pa. at 435, 648 A.2d at 1189.

*Commonwealth v. Clay*, 64 A.3d 1049, 1054–55 (Pa. 2013).

In other words, "[a] weight of the evidence claim concedes that the evidence is sufficient to sustain the verdict, but seeks a new trial on the ground that the evidence was so one-sided or so weighted in favor of acquittal that a guilty verdict shocks one's sense of justice." *Commonwealth v. Lyons*, 79 A.3d 1053, 1067 (Pa. 2013).

This Court's standard of review in evaluating a trial court's ruling on a weight of the evidence claim is different than the standard of review applied by the trial court:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. *Brown*, 648 A.2d at 1189. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. *Commonwealth v. Farquharson*, 467 Pa. 50, 354 A.2d 545 (Pa. 1976). One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Widmer,* 560 Pa. at 321–22, 744 A.2d at 753 (emphasis added).

> This does not mean that the exercise of discretion by the trial court in granting or denying a motion for a new trial based on a challenge to the weight of the evidence is unfettered. In describing the limits of a trial court's discretion, we have explained:

The term "discretion" imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

*Widmer,* 560 Pa. at 322, 744 A.2d at 753 (quoting *Coker v. S.M. Flickinger Co.,* 533 Pa. 441, 447, 625 A.2d 1181, 1184–85 (1993)).

*Clay*, 64 A.3d at 1055.

Further, our Supreme Court has clarified that:

[t]o determine whether a trial court's decision constituted a palpable abuse of discretion, an appellate court must "examine the record and assess the weight of the evidence; *not however, as the trial judge, to determine whether the preponderance of the evidence opposes the verdict, but rather to determine whether the court below in so finding plainly exceeded the limits of judicial discretion and invaded the exclusive domain of the jury.*" Where the record adequately supports the trial court, the trial court has acted within the limits of its judicial discretion.

*Id*. at 1056 (quoting *Brown*, 648 A.2d at 1190 (citation omitted)) (emphasis in original).[8]

_____

[8] The dissent contends that the Commonwealth waived its weight of the evidence claim by failing to properly frame its issue for our review by arguing how the trial court abused its discretion in this case. However, the Commonwealth sets forth the appropriate standard of review in its brief and argues that the trial court improperly substituted its judgment for that of the jury in finding the weight to be given to Dr. O'Brien's testimony. We see no reason to find the Commonwealth's challenge to be waived on this basis.

In this case, in reviewing Landis's post-sentence motion in which he claimed the jury's verdict was against the weight of the evidence, the trial court failed to review all the evidence presented at trial. Rather, the trial court instead solely focused on the expert testimony presented by the prosecution rebuttal expert, Dr. O'Brien and made its own personal characterization of that testimony.

The trial court granted Landis a new trial and found Dr. O'Brien had given false testimony when Dr. O'Brien asserted that there was documentation in the police investigative reports that Landis had discussed with Ms. Brown and Ms. Johnson his intent to shoot his wife before the victim's death. The trial court concluded that Dr. O'Brien's expert opinion was not competent as his incorrect statement showed that Dr. O'Brien had based his opinion on facts not in the record.

Further, the trial court concluded that the defense had been unfairly surprised by Dr. O'Brien's statement as his expert report was not entered as an exhibit at trial and criticized Dr. O'Brien for testifying without notes of his evaluation of Landis.

Noting that the issue of whether Landis had diminished capacity at the time of the victim's death was the crucial issue in both of his trials, the trial court decided that the only competent expert report was that of Dr. Rotenberg, who opined that Landis was incapable of forming the specific intent to kill the victim.

However, the issue before the trial court was whether the jury's verdict was against the weight of the evidence. It was the jury's function to make credibility determinations as to all the witnesses and to resolve discrepancies in their testimony. It was not for the trial court to overturn the jury's verdict simply because it would have made a different credibility finding as to one single witness.

As our Supreme Court stated in **Widmer**:

> [w]here a trial court offers nothing more than the assertion that on the same facts he would have arrived at a conclusion different from the verdict of the jury, a challenge to the weight of the evidence cannot be sustained. To permit such a broad interpretation of discretion would result in adding each and every trial judge in the Commonwealth of Pennsylvania as the thirteenth juror in every case.

**Widmer**, 744 A.2d at 754.

To the extent that it was proper for the trial court to evaluate whether Dr. O'Brien's expert testimony was competent,[9] we note that the trial court

_____

[9] We point out that the trial court failed to recognize that Landis has never asserted that he was entitled to a new trial solely on the basis of Dr. O'Brien's erroneous testimony. Landis has never claimed Dr. O'Brien's expert opinion should have been declared incompetent on the basis of his mistaken testimony. At trial, Landis did not object to Dr. O'Brien's testimony and did not bring Dr. O'Brien's incorrect statement to the trial court's attention until he cited it in his post-sentence motion, in which Landis merely claimed that, due to this inaccuracy, Dr. O'Brien's testimony was not entitled to as much weight as the opinion of defense expert Dr. Rotenberg.

However, the Commonwealth has not challenged the trial court's *sua sponte* decision to find Dr. O'Brien's expert testimony to be incompetent. As such, we may not assert this ground for relief on the Commonwealth's behalf. **See Commonwealth v. Wolfel**, 233 A.3d 784, 790 (Pa. 2020) (stating "the Commonwealth waived its challenge to Appellant's failure to raise a claim

*(Footnote Continued Next Page)*

did not observe precedent observing that, in determining whether expert testimony should be rendered incompetent, courts must evaluate whether the expert opinion had an adequate factual basis. *Sullivan v. Werner Co.*, 253 A.3d 730, 752 (Pa.Super. 2021) (citation omitted). *See also Newcomer v. Workmen's Compensation Appeal Board (Ward Trucking Co.)*, 692 A.2d 1062, 1066 (Pa. 1997) (concluding that an expert opinion cannot be *solely* based on inaccurate or false information). *See also In re Nevling*, 907 A.2d 672, 675 (Pa.Cmwlth. 2006) (stating that "the opinion of a medical expert must be reviewed as a whole and inaccurate information will not render the opinion incompetent unless the opinion is dependent on those inaccuracies").[10]

However, the trial court made no attempt to evaluate Dr. O'Brien's expert opinion as a whole to determine whether his opinion was dependent solely on his inaccurate statement or whether it was grounded in an adequate basis of record fact relating to his evaluation of Landis as well as Landis's behavior before the victim's murder.

In finding Dr. O'Brien's testimony to be incompetent, the trial court, based on its own personal conclusion, stated that Landis was unfairly surprised

_____

under Article I, Section 8, by failing to challenge the suppression court's explicit invocation of that provision before the Superior Court").

[10] "This Court is not bound by the decisions of the Commonwealth Court. However, such decisions provide persuasive authority, and we may turn to our colleagues on the Commonwealth Court for guidance when appropriate." *Commonwealth v. Hunt*, 220 A.3d 582, 591 n. 6 (Pa.Super. 2019) (citations omitted).

by Dr. O'Brien's testimony and assumed that the Commonwealth failed to provide the defense with Dr. O'Brien's expert report. However, the parties agree Dr. O'Brien's report was provided to the defense in pretrial discovery although the report was never entered into evidence.

In addition, while the trial court criticized Dr. O'Brien for not retaining his notes of his evaluation of Landis as his secretaries had "pulled the file" after the case had gone on for an extended period of time, the trial court cited no precedent finding that an expert's testimony is invalidated when the expert did not retain his notes from his evaluation or if his expert opinion is not entered into evidence.

For the foregoing reasons, we find the trial court plainly exceeded the limits of judicial discretion and invaded the exclusive domain of the jury. **See Clay**, **supra**. The trial court did not review the evidence presented at trial as a whole, merely reassessed the credibility of the prosecution's expert witness based on one incorrect statement that the witness made, and completely disregarded the expert's testimony without determining if the expert's opinion had an adequate factual basis.

While the jury was free to weigh the testimony of the competing experts as well as the basis for their expert opinions, the trial court substituted its own credibility determination for that of the jury and simply overturned the jury's verdict as it indicated that it would have arrived at a different conclusion.

Thus, we conclude that the trial court abused its discretion in granting Landis's post-sentence motion based on his weight of the evidence claim.

Order reversed.  Reinstate the judgment of sentence previously entered on November 12, 2020.  Jurisdiction relinquished.

Judge Olson joins the Opinion.

Judge Kunselman files a Dissenting Opinion.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/26/2022