J-S07007-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ORLANDO CEPEDA, JR. | : | |
| | : | |
| Appellant | : | No. 133 MDA 2023 |

Appeal from the Judgment of Sentence Entered December 1, 2022
In the Court of Common Pleas of Snyder County Criminal Division at
No(s): CP-55-CR-0000267-2021

BEFORE: LAZARUS, P.J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY LAZARUS, P.J.:           **FILED JUNE 06, 2024**

     Orlando Cepeda, Jr., appeals from the judgment of sentence, entered in the Court of Common Pleas of Snyder County, following his convictions of one count each of possession with intent to deliver (PWID) – methamphetamine,[1] conspiracy,[2] and criminal use of a communication facility (CUCF).[3] After review, we affirm.

     The instant case arose from the Forty-Fifth Statewide Investigating Grand Jury. *See* Order Accepting Presentment Number 17, 4/19/21, at 1. Pertaining to Cepeda, the Grand Jury Presentment alleged that he was part of

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 35 P.S. § 780-113(a)(30).

[2] 18 Pa.C.S.A. § 903.

[3] *Id.* at § 7512(a).

a larger methamphetamine distribution network in Snyder, Union, and Northumberland Counties. Ultimately, through its investigation, the Commonwealth determined that Cepeda was the primary methamphetamine supplier, and that Russell Kinslow was the "front." We provide the following factual summary beginning with the inception of the investigation.

In 2018, Monica Strocko was under supervision by Snyder County Probation. Strocko attended a routine office visit, where Snyder County Probation found immense amounts of information relating to drug activity on Strocko's phone including, but not limited to, pictures of drugs, pictures of money, and times and dates of transactions. As a result, Snyder County Probation contacted the Snyder County Police Department, who assigned Detective Douglas Bickhart to investigate.

Detective Bickhart, based upon the evidence uncovered by Snyder County Probation from Strocko's phone, sought and received a sealed search warrant for Strocko's cell phone. Detective Bickhart downloaded the contents of the phone. As Detective Bickhart reviewed the contents of the phone, it became apparent that Kinslow was involved in much of the methamphetamine activity detailed. Detective Bickhart was familiar with Kinslow's name at the time because word of mouth in the community indicated that Kinslow was dealing methamphetamine.

Detective Bickhart began officially investigating Kinslow and contacted the Pennsylvania State Police (PSP) for assistance. PSP assigned Trooper Brett Herbst who, at the time, was the head of the Vice Unit for the PSP in

Montoursville. Detective Bickhart requested PSP to provide any information they had on Kinslow that would further his investigation.

Trooper Herbst agreed to assist Detective Bickhart and they agreed that Detective Bickhart would take the lead in investigating Kinslow and, as the investigation progressed, Cepeda. Trooper Herbst relayed to Detective Bickhart that PSP had an open investigation into Kinslow because Kinslow had made multiple deliveries of methamphetamines to a confidential informant (CI) in a controlled buy. Trooper Herbst oversaw the CI, "Jadrick Haines," for several controlled drug transactions. Trooper Herbst was also utilizing his CI to investigate Samala Wilson as a person of interest in the PSP's investigation into Kinslow.

During one of the controlled buys, Trooper Herbst set up surveillance of the Harbor Freight store. The CI entered the Harbor Freight store with Wilson. Wilson and the CI waited until Kinslow arrived. Kinslow provided methamphetamine to Wilson who, in turn, provided methamphetamine to the CI. In the second controlled buy, at a garage outside of Freeburg where Kinslow owned garage space, the same CI went to the garage and met Wilson. Wilson entered the garage, weighed out the methamphetamine Kinslow had provided, and sold the methamphetamine to the CI.

Trooper Ryan Kelley, another Trooper involved in PSP's investigation into Kinslow, oversaw a different CI, "C.J.," for several controlled drug transactions. After Trooper Kelley's CI made two successful controlled purchases, Trooper Kelley set up surveillance at Freedom Towing, a business

located in Lewisburg. Trooper Kelley and his CI arranged to purchase two ounces of methamphetamine from Kinslow in exchange for $1,500.00. The CI entered Freedom Towing with the approved funds, purchased the methamphetamine from Kinslow, and provided the drugs to Trooper Kelley.

As a result of the above-described controlled buys and the ensuing investigation, Detective Bickhart became aware of an individual named "O," who was later identified as Cepeda. Several witnesses used in the investigations into Kinslow identified Cepeda as Kinslow's methamphetamine supplier. In particular, Detective Bickhart identified Wilson, Felicia Buck, Jamie Aughenbaugh, and Uriah Fausey as individuals who identified Cepeda as Kinslow's supplier. Wilson, Buck, Aughenbaugh, and Fausey each, on separate occasions, traveled with Kinslow to purchase methamphetamine from Cepeda. Later in the investigation, Aughenbaugh, Buck, and Fausey identified Cepeda in photo arrays.

Fausey met Cepeda, for the first time, in the late summer of 2018. Fausey was using methamphetamines with his friend and Cepeda's cousin, "Chino." Fausey and Chino went to Laughter's, a bar in Sunbury, where they met with Cepeda. No drugs were exchanged at this time. However, Fausey met with Cepeda a second time, when Fausey and Cepeda exchanged marijuana for methamphetamine. Fausey met Cepeda for a third time in Freeburg to pay off Aughenbaugh's "debt" because Aughenbaugh was using more methamphetamine than she could afford and owed Cepeda $400.00.

- 4 -

Fausey met Cepeda for a fourth time with Kinslow. Fausey and Kinslow drove together towards Reading, where Kinslow dropped Fausey off at a diner. During the drive, Kinslow indicated that he was going to procure three ounces of methamphetamine from Cepeda. Kinslow returned to the diner approximately 20 minutes later with three eightballs, or three ounces, of methamphetamine.

Aughenbaugh, at the time a heavy user of methamphetamine, went to her friend, Richie Whipple's, house several times a week to use methamphetamine. Cepeda made multiple appearances at Whipple's house to sell methamphetamine to Whipple and Chino. Aughenbaugh never saw Cepeda directly supply methamphetamine to Whipple; however, Whipple did not have meth at his house until Cepeda stopped by. *See* N.T. Jury Trial (Day 2), 11/1/22, at 13 (Aughenbaugh testifying "[Whipple] would have to wait for [Cepeda] to get there to bring meth. Never saw it, like, hand-to-hand transactions. There was another room [they would use] for a lot of things, [and Cepeda] would come to supply Chino[.]"); *id.* at 14 ("there would be [no methamphetamine], they would be empty, and then when [Cepeda] would arrive, there would be stuff"); *id.* (Aughenbaugh testifying that Whipple repeatedly stated he was unable to provide methamphetamine until Cepeda came by). After Cepeda left Whipple's house, Aughenbaugh would buy methamphetamine from Whipple. *See id.* at 19 (Aughenbaugh testifying she would purchase "eightballs" from Whipple).

Aughenbaugh was also familiar with Kinslow and either purchased or was gifted methamphetamine from Kinslow on several occasions. Aughenbaugh testified that she traveled with Kinslow on multiple occasions to see Cepeda when Kinslow needed to acquire methamphetamine. Aughenbaugh and Kinslow traveled to Reading three times to acquire methamphetamine.

On one of these trips, Cepeda ordered Kinslow to bring Aughenbaugh to a meeting, at which time Cepeda confronted Aughenbaugh, who he believed was snitching on him. Upon arrival, Cepeda entered the backseat of the vehicle and told Aughenbaugh that "if [Cepeda] found out that I was snitching on him that my body would be down the Susquehanna River." *Id.* at 37.

On a subsequent trip, Kinslow, with Aughenbaugh in tow, parked in a parking lot and Cepeda entered the vehicle. At this point, Aughenbaugh was in the backseat of the vehicle and covered with a blanket because Cepeda did not want Kinslow to associate with Aughenbaugh.[4] Cepeda, who Aughenbaugh identified by his voice at this time, had a brief discussion with Kinslow. *See id.* at 27-30 (Aughenbaugh testifying she knew it was Cepeda by his voice but could not recall specific discussion topic). Afterwards, Cepeda exited the vehicle, and Kinslow revealed that he now had methamphetamine. Aughenbaugh and Kinslow used approximately an ounce of methamphetamine to get high.

---

[4] As mentioned above, Cepeda believed that Aughenbaugh was an informant for the police. *See id.* at 26-28, 36-38.

Aughenbaugh also knew an individual by the name of Nate Posten, who was a friend and fellow user of methamphetamine. In the summer of 2018, Aughenbaugh would frequently spend time with Posten to use methamphetamine together. Posten purchased his methamphetamine from Chino in the summer of 2018. During this time, Chino obtained his methamphetamine supply from Cepeda.

Wilson,[5] who was a heavy drug user and dealer, also testified against Cepeda. Wilson used heroin for eight years before being introduced to methamphetamine. Wilson began acquiring methamphetamine from Kinslow. Wilson and Kinslow entered into an arrangement whereby Wilson would sell methamphetamine for Kinslow in exchange for a small amount of methamphetamine for Wilson's personal use. Kinslow provided Wilson with methamphetamines once or twice a week. At the beginning of their arrangement, Kinslow provided only an eightball to Wilson. However, as the arrangement went on and sales improved, Kinslow began providing Wilson with an ounce of methamphetamine twice a week. As Wilson became more enmeshed in the methamphetamine network, Kinslow informed her that he received his methamphetamine supplies from "O," whom he later identified as Cepeda. Wilson and Kinslow discussed "O" as the source of the

_____

[5] As a result of her involvement, summarized throughout this memorandum, Wilson was charged and convicted in relation to the methamphetamine operation and was placed in a halfway house. While in the halfway house, Wilson met with Detective Bickhart and agreed to assist in his investigation.

methamphetamine multiple times and, eventually, Wilson began making trips to see "O" with Kinslow.

Wilson agreed to go on these trips with Kinslow because, in return, Kinslow gave her more methamphetamine for personal use. During these trips, Wilson did not see any drugs change hands. However, Wilson counted the money for Kinslow, and was able to identify "O" as Cepeda. *See id.* at 63-65 (Wilson testifying Kinslow was bad with money and requested Wilson to count money for him); *see also id.* (Wilson testifying that she saw Cepeda talk to Kinslow); *see also id.* at 63-65, 70-71 (Wilson testifying, on several occasions, Kinslow and Cepeda FaceTimed her so she could count money virtually). Wilson and Kinslow made six trips to see "O" together. "O" provided Kinslow with increasing amounts of methamphetamine, which began with a few ounces and escalated to a pound-and-a-half of methamphetamine. *See id.* at 73-75.

At some point, Wilson and Kinslow stopped traveling to see "O" together.[6] However, Kinslow suddenly resumed the trips, and forced Wilson[7] to travel to a new location with him. Kinslow and Wilson drove to Sunbury,

---

[6] Wilson testified that she stopped going with Kinslow because she was trying to stop using and selling methamphetamine. *See id.* at 88.

[7] Wilson testified that, rather suddenly, Kinslow broke into her apartment and stole her belongings. *See id.* at 83-84. Kinslow refused to return Wilson's belongings until Wilson agreed to attend additional visits to see "O" with Kinslow. *See id.*

where they met with "O," who was in another vehicle. Kinslow passed a large sum of money to "O," who then provided Kinslow with methamphetamine.

Buck,[8] a methamphetamine user like Wilson, purchased two ounces of methamphetamine from Kinslow every week. During their transactions, Kinslow told Buck several times that Cepeda was the supplier. Buck sold some of the purchased methamphetamine and used the remaining amount for herself. The amounts sold and used varied based on Buck's ability to sell methamphetamine weighed against Buck's need to use the methamphetamine herself.

At some point in 2018, Kinslow began taking Buck on his trips to get more methamphetamine from Cepeda. Kinslow and Buck traveled to the Econo Lodge in Shamokin Dam and met Cepeda in one of the hotel rooms. Kinslow and Cepeda conducted methamphetamine transactions, in front of Buck, in the hotel room.

On September 27, 2021, the Commonwealth filed a Criminal Information charging Cepeda with the above-mentioned offenses. After numerous continuances, Cepeda filed a speedy trial motion, pursuant to Pa.R.Crim.P. 600, which the trial court denied. Ultimately, after additional continuances, the trial court scheduled trial for October 31, 2022. On October 28, 2022, three days before trial, Cepeda filed a motion *in limine*, in which he

---

[8] During Trooper Herbst's investigation, a CI purchased methamphetamine from Buck. **See id.** at 145-48. As a result, Buck was arrested and charged. While Buck was incarcerated for those charges, she agreed to assist Detective Bickhart in his investigation. **See id.** at 158.

sought to preclude all witnesses from testifying about any hearsay statements that may be attributed to Kinslow. *See* Motion *in Limine*, 10/28/22, at 1-2. The trial court heard arguments on the motion on October 31, 2022, prior to the commencement of trial. The trial court denied the motion and concluded that Cepeda's motion was too vague, as it did not specify which witnesses or which statements he sought to preclude. *See* N.T. Jury Trial (Day 1), 10/31/22, at 3-6. The trial court denied the motion *in limine* on the additional basis that the statements were likely admissible under the co-conspirator hearsay exception. *See id.* at 9-11 (citing *Commonwealth v. Feliciano*, 67 A.3d 19, 27-28 (Pa. Super. 2013) and Pa.R.E. 803(25)(E)). The trial court further instructed Cepeda that, due to the vagueness of his motion *in limine*, he would need to make specific hearsay objections during trial when the alleged hearsay statements arose. *See* N.T. Jury Trial (Day 1), 10/31/22, at 9-11.

Cepeda proceeded to a three-day jury trial lasting from October 31 through November 2, 2022, after which the jury found Cepeda guilty of the above-mentioned offenses. The trial court deferred sentencing and ordered the preparation of a pre-sentence investigation report.

On December 1, 2022, the trial court conducted a sentencing hearing. The trial court sentenced Cepeda to consecutive sentences of 7½ to 20 years' incarceration for PWID, 5 to 10 years' incarceration for conspiracy, and 1½ to 5 years' incarceration for CUCF, resulting in an aggregate sentence of 14 to

35 years' incarceration. The trial court credited Cepeda for 331 days of time served.

Cepeda filed a timely post-sentence motion,[9] which the trial court denied on December 28, 2022. Cepeda filed a timely notice of appeal and a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Cepeda now raises the following claims for our review:

> [1.] Did the [trial] court err in denying [Cepeda's] motion *in limine* and in-trial objections to preclude witnesses from testifying to alleged statements made by non-testifying, alleged co-conspirators of [Cepeda] as the statements did not fall under the co-conspirator exception to the hearsay rule?
>
> [2.] Did the [trial] court abuse its discretion in sentencing [Cepeda] to an aggregate [14 to 35] years[' incarceration] as it applied the wrong standard range to the sentencing guidelines?
>
> [3.] Did the [trial] court abuse its discretion in denying [Cepeda's] motion for a new trial as the verdicts were against the weight of the evidence?

Brief for Appellant, at 5.

In his first claim, Cepeda argues that the trial court erred in denying his motion *in limine* to preclude witnesses from testifying to statements, allegedly made by Kinslow and Whipple, under the co-conspirator exception to the

---

[9] The 10th day to file a timely post-sentence motion was December 11, 2022, a Sunday and, accordingly, Cepeda had until December 12, 2022, to file a timely post-sentence motion. **See** 1 Pa.C.S.A. § 1908 ("[w]henever the last day of any such time period shall fall on a Saturday or Sunday . . . such day shall be omitted from the computation."); **see also** Pa.R.Crim.P. 720(A)(1) ("a written post-sentence motion shall be filed no later than 10 days after imposition of sentence"). Therefore, Cepeda's post-sentence motion, filed on December 12, 2022, was timely filed.

hearsay rule. *See id.* at 18-19. In particular, Cepeda claims that Fausey, Aughenbaugh, Wilson, and Buck were all improperly permitted to testify to hearsay statements from Kinslow and Whipple. *Id.* at 18-20.

As a preliminary matter, we conclude that Cepeda has waived these challenges. First, Cepeda did not include a challenge to any alleged statements attributed to Whipple in his Rule 1925(b) concise statement of errors complained of on appeal, or in the underlying motion *in limine*. *See* Pa.R.A.P. 1925(b)(4)(vii) ("[i]ssues not included in the statement . . . are waived"); *see also* Motion *in Limine*, 10/28/22, at 1-2 (challenging Kinslow's purported hearsay statement); Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."). Furthermore, Cepeda does not cite to where in the record the hearsay statements were admitted, or where he preserved objections to them. *See* Pa.R.A.P. 2119(c) (providing appellant's argument shall include "reference[s] to the place in the record where the matter referred to appears"); *see also* ***Commonwealth v. Samuel***, 102 A.3d 1001, 1005 (Pa. Super. 2014) ("It is not this Court's responsibility to comb through the record seeking the factual underpinnings of an appellant's claim."). This case involved a three-day jury trial with multiple witnesses and several exhibits, yet Cepeda's two-page argument is silent as to where he made the alleged objections preserving his claim. *See* Brief for Appellant, at 18-20. Accordingly, any challenge regarding Whipple's alleged statements has been waived.

Second, regarding Cepeda's challenge to the alleged statements of Kinslow, we conclude Cepeda has waived this claim on two separate grounds. First, throughout his two-page argument on this claim, Cepeda fails to cite to where in the record the hearsay statements were admitted, or where he objected. *See* Pa.R.A.P. 2119(c); *Samuels*, *supra*. Consequently, this claim is waived.

Second, this claim is also waived because Cepeda failed to properly preserve it before the trial court. Prior to trial, Cepeda filed a motion *in limine* to preclude all witnesses from testifying as to any hearsay statements from Kinslow. *See* Motion *in Limine*, 10/28/22, at 1-2. The trial court ultimately denied this motion because it was unable, at the time, to adequately assess whether the testimony should be limited where the motion failed to specify which witnesses and hearsay statements were at issue. *See* N.T. Jury Trial (Day 1), 10/31/22, at 4-11.[10] Consequently, under our case law, Cepeda was required to preserve the objections initially raised by his motion *in limine* throughout the trial with timely and specific objections. *See Commonwealth v. McGriff*, 160 A.3d 863, 866 (Pa. Super. 2017) ("Consistent with . . . Pa.R.E. 103(a)[, pertaining to preserving claims of error,] a motion *in limine* may preserve an objection for appeal without any need to renew the objection at

---

[10] After making its ruling, the trial court informed Cepeda that he would be permitted to raise these objections at the appropriate time(s) throughout trial with more specificity. *See id.* As noted *supra*, the trial court also suggested that the statements may be admissible under the co-conspirator hearsay exception. *See id.*; *see also* Pa.R.E. 803(25)(E).

trial, **but only if the trial court clearly and definitively rules on the motion**.") (emphasis added, quotation omitted). Here, the trial court denied Cepeda's motion *in limine* because it lacked the required specificity. ***See*** N.T. Jury Trial (Day 1), 10/31/22, at 4-11. Thus, Cepeda was required to make timely and specific objections throughout trial, and was further required to properly preserve those objections for appellate review. ***See McGriff***, ***supra***. Cepeda failed to raise those objections in his Rule 1925(b) statement, instead choosing to challenge the trial court's denial of his motion *in limine*. ***See McGriff***, ***supra***; ***see also*** Pa.R.A.P. 1925(b)(4)(vii). Accordingly, any challenge regarding Kinslow's alleged statements has been waived.

In his second claim, Cepeda argues that the trial court abused its discretion in sentencing him to an aggregate term of 14 to 35 years' incarceration by incorrectly calculating his offense gravity score (OGS). ***See*** Brief for Appellant, at 21-24. Cepeda's claim challenges the discretionary aspects of his sentence, from which there is no automatic right to appeal. ***See Commonwealth v. Sunealitis***, 153 A.3d 414, 420 (Pa. Super. 2016) (claim that court applied incorrect OGS implicates discretionary aspects of sentencing). Prior to reaching the merits of a discretionary sentencing issue,

> [this Court conducts] a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, ***see*** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, ***see*** Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

- 14 -

*Commonwealth v. Moury*, 992 A.2d 162, 170 (Pa. Super. 2010) (quotation marks and some citations omitted).

Here, Cepeda has filed a timely notice of appeal, a post-sentence motion preserving the claim, and properly included a Rule 2119(f) statement in his brief. We also conclude that Cepeda has satisfied the fourth requirement, as an allegation that the trial court inappropriately calculated the OGS raises a substantial question. *See Sunealitis*, 153 A.3d at 421 (citing *Commonwealth v. Archer*, 722 A.2d 203, 210-11 (Pa. Super. 1998)). Thus, we may address the merits of Cepeda's claim.

Our standard of review for a claim challenging the trial court's OGS calculation is a matter of statutory interpretation, which raises a question of law. *See Sunealitis*, 153 A.3d at 421 (citing *Commonwealth v. Johnson*, 125 A.3d 822 (Pa. Super. 2015)). Accordingly, we apply a *de novo* standard of review. *See Sunealitis*, 153 A.3d at 421.

We previously explained, in *Commonwealth v. Spenny*, 128 A.3d 234 (Pa. Super. 2015), that

> When sentencing a criminal defendant convicted of a felony and/or misdemeanor, the trial court must consider, *inter alia*, the sentencing guidelines adopted by the Pennsylvania Commission on Sentencing ([]Sentencing Commission[]). 42 Pa.C.S.A. § 9721(b); 204 Pa.Code 303.1(a). To determine the guideline sentence for each conviction, the trial court must establish the [OGS] and . . . the defendant's prior record score. 204 Pa.Code § 303.2(a).

*Id.* at 242.

Instantly, Cepeda contends that there was no factual basis to support the trial court's conclusion that the methamphetamine weighed between 100 and 1000 grams. **See** Brief for Appellant, at 22. Cepeda asserts that the Commonwealth presented proof that Cepeda possessed, distributed, and conspired to distribute approximately 43 grams of methamphetamine. **Id.** Cepeda posits that the additional 89 grams of methamphetamine, referenced by the trial court, cannot be attributed to Cepeda because that methamphetamine was acquired through controlled purchases from Kinslow, not Cepeda, and the purchases were not in furtherance of any conspiracy between Kinslow and Cepeda. **See id.** Cepeda argues that Kinslow had other suppliers and, consequently, the Commonwealth did not, and could not, prove that all the methamphetamine came from Cepeda. **See id.** at 23-24. We disagree.

Cepeda does not dispute that his prior record score was properly calculated as five. At issue is the trial court's calculation of the OGS for PWID as eleven. **See** Brief for Appellant, at 21-24. As noted **supra**, the trial court determined that Cepeda possessed between 100 and 1000 grams of methamphetamine by relying on its interpretation of the Commonwealth's evidence. Additionally, the trial court considered the aggregate weight of the methamphetamine, presented at trial, that the PSP seized throughout their investigation. **See** Trial Court Opinion, 9/11/23, at 2-4 (unpaginated).

The trial court provided the following explanation in its opinion:

Throughout the trial, the lay witnesses involved in the drug transactions involving [Cepeda] testified to multiple trips to purchase methamphetamines from [him]. While the lay witnesses did not testify to precise weights they testified to ounces, grams, and balls.

In addition, law enforcement testified as to weights that were purchased from [Cepeda's] co-conspirator, Kinslow, that had actual weights. Trooper [] Kelly testified that one controlled buy from [Kinslow] involve[d] an amount of [] 46.7 grams [of methamphetamine]. Trooper [] Herbst testified to one controlled buy from [Kinslow] of [] 14.3 grams [of methamphetamine]. In addition, Detective [] Bickhart testified that [in two controlled buys] from [Kinslow], [the aggregate weights were] 29 grams [of methamphetamine]. Based on law enforcement's testimony, 89 grams of methamphetamine could be traced from [Kinslow] directly to [Cepeda]. That[,] coupled with the testimony of the lay witnesses regarding the amounts of methamphetamine purchased from [Cepeda] over a course of time, it is clear that well in excess of [] 100 grams of methamphetamine were sold by [Cepeda].

Trial Court Opinion, 9/11/23, at 2-4 (unpaginated).

Furthermore, we observe that one ounce is equivalent to 28 grams. *See* www.metric-conversions.org (last visited May 9, 2024); *see also* N.T. Jury Trial (Day 1), 10/31/22, at 70 (Detective Bickhart testifying one ounce is approximately 28 grams). Wilson testified that she purchased one or two ounces, or 28 to 56 grams, of methamphetamine **every week** from Kinslow, who was supplied by Cepeda. *See* N.T. Jury Trial (Day 2), 11/1/22, at 60-61. Therefore, the trial court merely had to attribute any of Wilson's purchases to Cepeda in order to break the 100-gram threshold for an OGS of 11. It is clear from the quoted portion of the trial court's opinion that it attributed at least one of Wilson's purchases to Cepeda and, consequently, determined that Cepeda's offense had an OGS of 11. *See* Trial Court Opinion, 9/11/23, at 2-

4 (unpaginated). We conclude that the trial court did not err in calculating Cepeda's OGS as eleven and we agree with the trial court's findings and determinations. Accordingly, Cepeda is not entitled to relief on this claim.

In his third claim, Cepeda argues that the verdicts were against the weight of the evidence and shock the conscience. *See* Brief for Appellant, at 24-25. Cepeda asserts that no drugs were located in his home, and he had no drugs on his person when he was arrested. *See id.* Cepeda claims that the only evidence linking him to the conspiracy was the testimony of alleged co-conspirators, all of whom had methamphetamine habits and "impressive *crimen falsi* records." *Id.* at 25-26.

Our standard of review is well-settled. "Appellate review of a weight claim is a review of the [trial court's] exercise of discretion, **not of the underlying question of whether the verdict is against the weight of the evidence**." *Commonwealth v. Widmer*, 744 A.2d 745, 753 (Pa. 2000) (emphasis added, citation omitted). Where the trial judge has had the opportunity to hear and see the evidence presented, "an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination[.]" *Id.* (citing *Commonwealth v. Farquharson*, 354 A.2d 545 (Pa. 1976)). A challenge to the weight of the evidence is one of the least assailable reasons for granting or denying a new trial. *See Widmer*, *supra*.

Nevertheless, a trial court's exercise of discretion is not unfettered. *See id.* The "propriety of the exercise of discretion in such an instance may be

assessed by the appellate process when it is apparent that there was an abuse of that discretion." *Id.* Moreover, the trier of fact "while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." *Commonwealth v. Britton*, 134 A.3d 83, 86 (Pa. Super. 2016).

In its opinion, the trial court concluded that the Commonwealth's witnesses were credible, and that the jury believed the evidence presented by the Commonwealth. *See* Trial Court Opinion, 9/11/23, at 6 (unpaginated). Further, the trial court noted that the jury was free to believe all, part, or none of the evidence and concluded that the jury's belief in the Commonwealth's evidence did not shock the conscience. *See id.* After reviewing the record, we conclude that the trial court did not abuse its discretion in denying Cepeda's weight claim and, accordingly, he is entitled to no relief. *See Widmer*, *supra*.

Judgment of sentence affirmed.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary

Date: 06/06/2024